No. 85-220

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

CLARK BROS. CONTRACTORS,

        Plaintiff and Appellant,

  -vs-

STATE OF MONTANA,

        Defendant and Respondent,

APPEAL FROM: District Court of the Sixth Judicial District,
In and for the County of Sweet Grass,
The Honorable Byron Robb, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Gough, Shanahan, Johnson & Waterman; Ronald F.
Waterman, Helena, Montana
Winston & Cashatt; Patrick A. Sullivan, Spokane,
Washington

    For Respondent:

        W. D. Hutchinson, Dept. of Highways, Helena, Montana

Submitted on briefs: Sept. 6, 1985

Decided: December 4, 1985

Filed: DEC - 4 1985

Ethel M. Harrison
_____
Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Plaintiff Clark Bros. Contractors appeals the February 25, 1985, decision of the Sixth Judicial District in favor of the defendant State of Montana. We vacate the District Court judgment and remand for trial.

Clark Bros. Contractors (Clark Bros.) is a Montana corporation which has been engaged in the highway construction business for 20 years, including many highway projects for the State of Montana (State). In late February or early March, 1979, the State sent out bid invitations for the construction of a segment of interstate near Big Timber, Montana. The invitation included a description of the project, and notice that subsurface data was available from the Materials Bureau in Helena. Bids were to be submitted by March 28, 1979.

In preparing its bid, Clark Bros. obtained cross-sections of the project area from the Materials Bureau, but not the subsurface data which was available. Officers of Clark Bros. did an on site inspection, and talked with local ranchers about soil conditions in the area. This was an area of concern because the segment of interstate to be built ran through a low lying irrigated farm valley, and would require substantial amounts of borrow (dirt secured from adjacent or nearby sources) to construct the foundation, or embankment, for the road.

Typically, the State provides estimates of the amount of borrow to be used in a project in its bid proposal. The borrow figure is arrived at by a three step process: 1) calculating the subsidence of the soil in place upon which the road is to be built; 2) calculating the shrinkage, or compaction, of the borrow that is to be used in the embankment; and 3) using the subsidence and shrinkage estimate to determine how much borrow will raise the road

2

embankment to design specifications. A typical shrink factor for borrow is about 10%. In the Big Timber project, an unusually high shrink factor of 40%, and 55% in some areas, was estimated by the State in its bid proposal. A provision in the proposal clearly stated the borrow figure was an estimate only.

In calculating its costs for the borrow work, Clark Bros. used the quantity estimates provided by the State. Clark Bros. submitted the lowest bid and was awarded the contract, which was executed on April 4, 1979. Pertinent contract provisions included allowing deviations of up to 25% in estimated quantities, that payment would only be for units of work performed, and that the borrow was to be provided by the contractor.

Clark Bros. began work in May, 1979, and completed the excavation, borrow, and embankment work by the end of the year. Measurement of the borrow pits showed that substantially less borrow had been used than estimated, so the State issued a change order on February 13, 1980, reflecting that fact. Clark Bros. signed the order under protest on June 5, 1980. The borrow underrun was approximately 18%, which significantly reduced the amount paid to Clark Bros. under the contract. Clark Bros. filed a claim on December 14, 1980, alleging a loss on the borrow work due to fixed costs and overhead. The State refused to settle, claiming it was only obligated to pay for units of work performed, and the contract further allowed for quantity deviations up to 25%. Clark Bros. filed suit.

The issues at trial were: 1) whether the State was negligent in preparing the shrinkage factor included in the bid proposal; 2) whether Clark Bros. was entitled to be paid for extra work incurred not contemplated by the contract; and 3) whether exculpatory language in the contract barred the

3

claims asserted by Clark Bros. The District Court found in favor of the State on each issue.

Clark Bros. asserts the following issues on appeal:

1. Was the District Court opinion supported by substantial evidence or was it clearly erroneous?

2. Did the District Court properly refuse to consider the deposition testimony of managing employees of the State?

3. Can the State of Montana avoid liability for material mistakes in information supplied to and relied upon by highway construction bidders by means of exculpatory contract language?

Clark Bros. assert numerous errors in the District Court opinion. The court found that Clark Bros.' method of computation, and selection of a borrow site without independently testing the soils, placed the risk of loss caused by an underrun on Clark Bros. While a reading of the contract may support these findings, other evidence was not taken into account because it was improperly excluded.

During trial, counsel for Clark Bros. twice attempted to introduce into evidence the deposition testimony of certain managing agents of the State. In refusing admission, the District Court relied upon (1) a lack of notice to the State that the depositions were to be offered, (2) that no cross-examination could be conducted, and (3) that Clark Bros. made no showing that the witnesses were unavailable. The District Court was in error.

Rule 32(a)(2), M.R.Civ.P. reads in part: "The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent . . . may be used by an adverse party for any purpose." There is no provision in Rule 32(a)(2), M.R.Civ.P. which requires a finding of unavailability of the witness or that notice was given of the intended use of a deposition at trial. Rule

4

32(a)(2), M.R.Civ.P. governs the use of depositions at trial, and the State's reliance on Rule 804 M.R.Evid. is misplaced. See Edington v. Creek Oil Co. (1984), 690 P.2d 970, 978, 41 St.Rep. 1990, 2000.

Whether one is to be considered a managing agent for the State depends on several factors, including the individual's right of general control, authority, and judgment within his department; whether the interests of the individual are identified to be those of the State; and whether any person of higher authority possesses knowledge about the matters at issue. See Terry v. Modern Woodmen of America (W.D.Mo. 1972), 57 F.R.D. 141; and Carroll v. Wisconsin Power & Light Co. (Wisc. 1956) 273 Wis. 490, 79 N.W. 2d 1.

In this case, the depositions offered were those of the chief of Materials Bureau, head of Location Road Design Section, chief of the Preconstruction Bureau, and assistant supervisor of Geology Section. We find the deposition testimony shows that these jobs, with the possible exception of the latter one, entail sufficient supervisory responsibility to place these individuals within the status of managing agents for the State. One might question the managerial status of assistant supervisor of Geology Section, but we need only focus on the deposition of the chief of Materials Bureau.

We find the deposition testimony of the chief of Materials Bureau to be useful evidence on the issue of justifiable reliance. The witness's statements acknowledge that the State is aware contractors rely on State estimates in preparing their bids. We find it was error to exclude this testimony.

The final issue is whether the exculpatory language of the contract relieves the State from liability for damages caused by the borrow underrun. The test previously applied

5

by this Court in similar cases has been whether the contractor justifiably relied upon the plans and specifications in preparing its bid and executing the contract.

William Clark testified that his company relied on the estimates provided by the State in preparing its bid, because it had neither the time nor resources to be independently investigating project data. Clark also testified that he did not obtain all the subsurface data which was made available by the Highway Department, but he did conduct on site investigation and talked to area ranchers about the local soil conditions.

The District Court found no justifiable reliance by Clark Bros., in part due to the exculpatory language contained in the contract. The contract explicitly provided: 1) that quantities in the bid proposal were estimates only; 2) that payment would only be for units of work performed; 3) that quantity deviations of less than 25% of the estimate were not cause for equitable adjustment; and 4) that the borrow source was to be secured by the contractor.

This is the first case before this Court concerning the effect of an exculpatory clause on the contractor's right to recover damages caused by a quantities underrun. Previous cases dealt with overruns but are analagous.

In Stenerson v. City of Kalispell (1981), 629 P.2d 773, 38 St.Rep. 938, the contractor prevailed where it had relied on the city's estimate of the amount of grading work to be done, yet ended up doing much more due to faulty estimates. One issue on appeal was whether exculpatory language exonerated the city. In holding such language to be a factor in determining justifiable reliance but not to be controlling this Court said:

> Several other cases have presented the issue of the effect of exculpatory clauses on a contractor's

6

right to recover in situations in which reliance is alleged by the contractor. In Haggart Const. Co. v. State Highway Comm'n (1967), 149 Mont. 422, 427 P.2d 686, Haggart bid on a highway construction job and was told that he could use gravel in State-optioned pits as described in the "Available Surfacing Materials Reports". The gravel was later found to be unsuitable and the plaintiff incurred additional expense in obtaining gravel elsewhere. The defendant did not deny that the materials reports were misleading, but rather relied on exculpatory provisions in the contract as a defense to the suit. Those provisions indicated that the Commission made no guaranty as to the quality and quantity of the materials available, and further that if the contractor chose to furnish his own materials, he would be responsible to produce satisfactory material.

The district judge found that the exculpatory provisions were not enforceable. He noted that Haggart received the materials reports only 14 days before bid letting, giving him little time to investigate independently. He further found that few contractors bidding on such projects have sufficient time or test facilities to make an intelligent appraisal of materials. Despite the exculpatory clauses, the district judge concluded:

"[T]here is nothing to show that appellant expect[ed] less than complete reliance on its materials reports.

"If the State Highway Commission were allowed to rely on the exculpatory provisions of the contract, the purpose for which such reports are offered would be sadly frustrated, if not totally destroyed. No prudent contractor would proceed in reliance on such reports at his absolute peril; the necessity to guard against unforeseen deficiencies would result in much higher bids than conditions would normally warrant." Haggart, supra, 149 Mont. at 425, 427 P.2d at 687-688.

We affirmed the district judge in that decision but noted:

"We are not here holding that such exculpatory clauses may not be enforced in other situations, that detrimental reliance may be assumed in all cases, or that parties to such contracts are bound to exercise anything less than reasonable and prudent judgment. In other words we will look to 'justifiable reliance.'" Haggart, supra, 149 Mont. at 428, 427 P.2d at 689.

629 P.2d 775, 776, 38 St.Rep. 941.

We find the Stenerson rationale persuasive. Exculpatory language in the contract is a factor in determining justifiable reliance but not controlling.

7

There is considerable evidence here upon which to find justifiable reliance. William Clark testified that he had two to three weeks in which to submit his bid, which was not adequate to perform his own quantities estimates, and that he relied on the State's estimates in preparing his bid. Clark conducted on site investigation and made further inquiry about the soils in the area, but found no reason not to use the State's estimates. Deposition testimony, improperly refused at trial, of the chief of the Materials Bureau indicated the State is aware contractors rely on the State's soil analysis. Nevertheless, we are reluctant to make a finding of justifiable reliance as a matter of law. The case should be retried considering the deposition testimony and applying the legal principles herein set forth.

We vacate the judgment of the District Court and remand for a new trial.

_____
Justice

We concur:

_____

_____

_____
Justices

8

Mr. Justice L. C. Gulbrandson, dissenting.

I respectfully dissent.

I would affirm the decision of the trial judge to exclude the offered depositions of State employees.

The State had propounded two sets of interrogatories to plaintiff, asking for identification of witnesses. Plaintiff never identified deponents as proposed witnesses although the interrogatories were continuing in nature, failed to list deponents in its proposed pre-trial order just prior to trial, and made no effort to subpoena said deponents. This Court, in Kopischke v. First Continental Corp. (1980), 187 Mont. 471, at 510-511, 610 P.2d 668, at 689, upheld the exclusion of a deposition which would indicate that Rule 32(a) should not be construed nor implemented in a void. The trial judge's finding of fact no. 40 clearly indicates that he was exercising his discretionary power to prevent an abuse of discovery. This Court, in Massaro v. Dunham (1979), 184 Mont. 400, at 404-405, 603 P.2d 249, at 251-252, stated:

> The District Court has the inherent discretionary power to control discovery. That power is based on the District Court's authority to control trial administration . . . In controlling discovery, the District Court must regulate traffic to insure a fair trial to all concerned, neither according one party an unfair advantage nor placing the other party at a disadvantage.
>
> . . .
>
> . . . Discovery fulfills this purpose by assuring the mutual knowledge of all relevant facts gathered by both parties which are essential to proper litigation. (Citations omitted.)

I also do not concur in the majority's decision to apply the Stenerson rationale to the underrun situation in

9

this case. In my view, there is substantial evidence in the record to support the trial judge's findings of fact and conclusions of law.

Several pertinent findings read as follows:

12. The state's invitation to bid and standard specifications called for unit price bids on listed work items. Two contract work items listed were item 111-030-000 (Excavation-Unclassified Borrow) in the amount of 1, 658,857 cubic yards, and item 112-001-000 (Compaction Roadbed) in the amount of 1,930,034 cubic yards. The State's standard specifications. . . concerning bid schedule quantities state:

"02.04 INTERPRETATION OF QUANTITIES IN BID SCHEDULE. The quantities appearing in the bid schedule are approximate only and are prepared for the comparison of bids. The unit prices to be tendered by the bidder are to be tendered expressly for the scheduled quantities as they may be increased or decreased within the restricting percentage hereinafter stipulated. Payment to the contractor will be made only for the actual quantities of work performed and accepted or materials furnished in accordance with the contract."

13. The material to be used as unclassified borrow was to come from contractor furnished sources, which was not unusual to the industry. Since such sources, were not identified until after the contract was awarded, the state could not test unclassified borrow material that would actually be used prior to estimating the quantities used in the bid schedule.

. . .

16. Rather than basing its bid on unit prices, Clark Bros. estimated the total cost of constructing the highway embankment in place, and then used the state's estimated quantities of unclassified borrow and roadbed compaction as divisors into its total projected costs to obtain unit prices for the borrow and compaction. By using such method, instead of that specified by the standard specs, plaintiff assured itself of claiming a loss if there were an underrun below the estimated quantities,

10

and claiming it should be paid more if there were an overrun above the estimated quantities for these items. William Clark also acknowledged his awareness that contractors were not to submit unbalanced bids.

17. The method used by plaintiff to compute unit prices also ignored these factors if there were an underrun: (a) Less equipment would be needed, or it would be needed for a shorter period. (b) Less hauling, fuel and manpower expense would be incurred. (c) Less landowner royalty would have to be paid for borrow.

. . .

30. The plain meaning and clear intent of standard specifications 02.04, 04.02 and 09.03 are that changes in quantity may occur in the actual performance of contract work between anticipated or estimated quantities, and actual quantities used, and in such event, the contractor will be paid at contracted unit prices for actual quantities used and will bear the risk of loss for changes of quantity of less than 25% for major items. The changes of the unclassified borrow and road compaction in this case were both less than 25%, and the testimony of Roger Blossom indicated this was not uncommon.

31. Plaintiff cannot be said to have justifiably relied on exact amounts of borrow and compaction work to do when the bid proposals and contract specifically provided the amounts were estimates and subject to increase or decrease, when plaintiff's officers were well acquainted with such terms and conditions, and when William Clark testified an overrun or underrun didn't much affect the total cost of a project and that plaintiff's bid would not have been much different whether the state estimated a round figure or specific amount of unclassified borrow or road compaction.

The trial judge, in an explanatory comment to his findings, stated:

It is difficult to see how the state could make it any clearer to contractors bidding on highway jobs that various parts of the work to be done, such as borrow excavation and compaction, are

11

just estimates and not specific amounts of materials to be supplied. If the contract terms and provisions are too loose in allowing for a 25% variation on such items, the contractor's association or the individual bidder should request amendment thereof before a contract is signed, but after execution, the court is "not to insert what has been omitted or to omit what has been inserted" (sec. 1-4-101, MCA 1983). As an experienced bidder and contractor, plaintiff must be held to the plain terms of the contract, as well as defendant.

I concur in that statement and would affirm the decision of the trial judge.

_____
Justice