No. 84-78

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

WILLIAM R. McGREGOR and LINDA KEENER
McGREGOR, d/b/a McGREGOR SERVICE,

        Plaintiffs and Respondents,

  -vs-

HOPE CUSHMAN MOMMER and THE ESTATE OF
PAUL CUSHMAN,

        Defendants and Appellants.

_____

APPEAL FROM: District Court of the Fifth Judicial District,
In and for the County of Madison,
The Honorable Mark Sullivan, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Johnson, Skakles & Kebe; Greg J. Skakles argued,
        Anaconda, Montana

    For Respondent:

        Poore, Roth, & Robinson; Donald Robinson argued,
        Butte, Montana

_____

Submitted: March 28, 1985

Decided: February 6, 1986

Filed: FEB 6 1986

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The defendants appeal following a four day jury trial completed on October 10, 1983, in the District Court of the Fifth Judicial District, Madison County, Montana. They appeal from the District Court's denial of their motions for directed verdict; from the judgment entered in accordance with the jury verdict; and from the District Court's order awarding attorney fees to plaintiffs. We reverse the judgment and remand for a new trial.

Hope Cushman (now Hope Cushman Mommer) and Paul Cushman (now deceased), defendants and appellants, (hereinafter referred to as Cushmans), bought a gas station in Twin Bridges, Montana in 1955. In 1970 they expanded by adding a wholesale operation to serve ranches in the area. This expansion required building a loading dock and warehouse; installing four 10,000 gallon storage tanks and tanks for customers; and buying a bulk truck to make deliveries. Paul Cushman also began having health problems in 1970. In September 1975 he suffered a heart attack and the doctor advised him to sell the business because of his limited life expectancy. They listed the property with a number of realtors in 1976, asking $158,000.

Bill McGregor was looking for employment at the time he heard the Cushmans' station was for sale. He contacted Paul Cushman and set up a meeting for April 1977. McGregor was interested in the station both because of the location (his wife taught in the Twin Bridges school system) and because he anticipated the family farm where he worked would be sold when his father retired.

At their first meeting McGregor received a prospectus Mrs. Cushman had prepared in 1976 for the various realtors. She had prepared the prospectus in order to give potential buyers an understanding of the business. It contained the reason the property was offered for sale, a description of the property and inventory and a list of customers, as well as the following statements:

> I know of no ranch that would give receipts like this business.
>
> Net
> ~~Gross~~ for 1974 was: $35,410.71
>
> Net
> ~~Gross~~ for 1975 was: $42,803.15

Mrs. Cushman changed the word "Gross" to "Net" for both 1974 and 1975 only on the copy of the prospectus given to McGregor and pointed out to McGregor that these changes were correct. The net profit of the business had averaged $9,368 for 1974 and 1975. The net for 1976 was $6,183 and there was a loss of $9,996 in the first five months of 1977. The average net profit for 1972-76 was less than $3,300 per year. The prospectus listed the gross profit (gross income less cost of goods sold) for 1974 and 1975.

McGregor asked the Cushmans to provide more information to support the figures in the prospectus. Mrs. Cushman responded saying she would get the figures from her son for a later meeting. At the third meeting she gave McGregor documents each entitled "Financial Statement" for 1974 and 1975 that concluded with the same figures as in the prospectus and showed double underlines under those figures. These documents did not include operating expenses. Bill Cushman, the Cushmans' son, attended the fourth meeting between Cushmans and McGregor in late April 1977. He had a

3

degree in accounting and testifed that he thought McGregor was not sophisticated in accounting and in dealing with financial statements; that he did not volunteer information about the business although he was available for questions; that the full financial statements and other documents were lying on the table at that meeting; and that the prospectus was misleading. McGregor's background was limited to two basic accounting courses taken during his first year of college. He testified that he understood the figures on the prospectus to represent net income.

The prospectus also included the following statement about one of the customers:

> . . . the one at Nevada City is exceptionally good for summer time tourist trade. Also this station is the only one to serve Va. city at this time during the winter.

This station took its last delivery on April 20, 1977 and closed on April 30, 1977. Cushmans' employee attended a going away party for the station owner on May 1, 1977. Until the closure, this station had taken deliveries about every 6-7 days and represented 35% of Cushmans' total receipts. They did not inform McGregor that this customer would no longer be available.

The following statement was also in the prospectus:

> To increase my gallonage, I also run my cash wholesale customers thru the station and still make a larger profit (on rent paid by Phillips paid on station gallonage each month.) Total: per gallon doing it this way is 6.18¢ profit.

This profit is termed "A-G rental payment." The Cushmans had done this while running the business. However, this was not permitted by the Phillips Company and Phillips would have terminated the contract if they had known of the practice.

4

The Cushmans operated the station as "consignees" rather than "jobbers" and recommended McGregor do the same. A consignee required less operating capital and Phillips carried the agricultural wholesale customer accounts on a nine-month interest free credit basis rather than requiring the station operator to carry these accounts. A jobber had a slightly higher profit margin on sales than a consignee and paid for the product as it was purchased from Phillips rather than as it was sold to station customers. McGregor met with a Phillips representative twice prior to entering the purchase agreement. Neither Phillips nor the Cushmans told McGregor that he would not be given a consignee contract and would have to take a jobber contract if he wanted to be affiliated with Phillips.

McGregor paid $2,000 as earnest money towards purchase of the Cushmans' business. By this time he had received an appraisal of $65,300 for the land, buildings, storage tanks and dock. This did not include the truck, wrecker, hand tools or inventory. At an inventory taken with McGregor present, the total value assigned to the merchandise was $27,200. The Cushmans respresented the inventory as saleable. McGregor determined that about $2,000 worth was out of date and unsaleable when, after a couple of years, the tires and other parts did not sell.

On June 7, 1977, McGregor and Cushmans entered into a contract where McGregor would pay $120,000 for the business excluding inventory. He made a down payment of $34,800 and made the required monthly payments of $814.51 through November 1981. McGregor's total payments to the Cushmans were $78,323.84. He purchased the inventory separately for $27,000.

McGregor operated the business so that the gross gallonage sold greatly increased each year. By 1980 his gross sales were over five times Cushmans' best year. However, he had difficulty maintaining an adequate cash flow throughout this period. The two main reasons for his cash flow problems were the debt service to Cushmans and the extra capital requirements needed for operation as a jobber rather than a consignee.

McGregor discovered that the figures in the prospectus were gross income rather than net income after speaking with a bank officer in late summer or early fall of 1981. The officer told him there was "no future" in the business so he went back to the information provided by the Cushmans to analyze and compare with his figures. At that time he realized the prospectus showed gross profit. He and a Phillips representative had discussions with the Cushmans in an effort to keep the business going but they did not reach an agreement. McGregor, during this time, traded in the truck used to make bulk deliveries and purchased a newer model. He later sold that truck and closed the wholesale operation. In addition he leased the service station out to another person.

McGregors filed their complaint against the Cushmans on June 22, 1982 seeking rescission of the purchase and sale contract for the retail and wholesale gasoline business and a return of monies paid pursuant to that agreement. The grounds for relief alleged were fraud through misrepresentation, undue influence, and failure of consideration. The alternative prayer for relief requested an order that Hope Cushman execute a warranty deed and bill of sale to the McGregors for the property. The McGregors also requested

general damages and attorneys' fees. The defendants counter-claimed requesting payment of amounts owed under the contract or a return of the property and damages sufficient to return the property to the condition at the time of sale. They also raised defenses of waiver, estoppel and laches.

The trial was scheduled to begin October 4, 1983. In the pre-trial order the McGregors included a request for damages because of lost interest and mental distress and alleged that the Cushmans' conduct violated a duty of good faith and fair dealing. The Cushmans' motion to prevent presentation of evidence on the new damages as not specifically pleaded and inappropriate was denied. The jury's verdict, by way of special interrogatory, found actual damages of $78,323 and mental anguish damages of $5,000 for the McGregors, and awarded the Cushmans an offset of $9,000.

Pursuant to post-trial motions, the trial judge awarded attorneys' fees of $20,032.78 and costs of $294.49 to the McGregors and denied deposition costs.

The issues on appeal are:

(1) Was there a sufficient factual dispute for the District Court to deny Cushmans' motions for a directed verdict and allow the case to be submitted to the jury?

(2) Is recission available as a remedy to McGregors?

(3) Did the District Court correctly instruct the jury on the implied covenant of good faith and fair dealing?

(4) Did the District Court err when it submitted the question of constructive fraud to the jury?

(5) Do the doctrines of estoppel and waiver defeat McGregors' claims as a matter of law?

(6) Did the District Court correctly refuse two of Cushmans' offered jury instructions on defenses?

(7) Did the District Court correctly allow testimony on mental distress and lost interest as part of McGregors' damages?

(8) Did the District Court correctly award costs and attorneys' fees to McGregors on the basis of the contract?

(9) Does the contract provision include the payment of attorneys' fees on appeal?

In the first issue, the defendants argue that their motions for directed verdict, made at the conclusions of plaintiffs' and their own cases, were improperly denied because there was insufficient evidence to allow recovery under the theory of actual fraud.

> "Motions for directed verdict or for judgment N.O.V. are proper only when there is a complete absence of any evidence to warrant submission to a jury. In this regard evidence and all inferences must be considered in the light most favorable to the party opposing directed verdict . . . " (Citations omitted.)

Jacques v. Montana National Guard (1982), 199 Mont. 493, 504, 649 P.2d 1319, 1325, quoting Karczewski v. Ford Motor Company (N.D. Ind. 1974), 382 F.Supp. 1346, 1348, aff'd. (7th Cir. 1975), 515 F.2d 511.

It would have been error to direct a verdict for defendants if plaintiffs submitted sufficient evidence of actual fraud at trial to make out a prima facie case, since actual fraud is a question of fact for the jury. Healy v. Ginoff (1923), 69 Mont. 116, 220 P. 539. The elements of actual fraud are:

1. A representation;
2. Falsity of the representation;
3. Materiality of the representation;
4. Speaker's knowledge of the falsity of the representation or ignorance of its truth;

8

> 5. Speaker's intent that it be relied upon;
> 6. The hearer's ignorance of the falsity of the representation;
> 7. The hearer's reliance on the representation;
> 8. The hearer's right to rely on the representation; and
> 9. Consequent and proximate injury caused by the reliance on the representation. (Citations omitted.)

Van Ettinger v. Pappin (1978), 180 Mont. 1, 10, 588 P.2d 988, 994.

Defendants contend that plaintiffs' evidence was insufficient to establish a false representation or justifiable reliance on the representation. Defendants argue that they made no representations as to net income and even if plaintiffs could show false statements on net income, consignee status, legality of A-G rental payments, and the closure of the Nevada City station, plaintiffs cannot demonstrate justifiable reliance on those statements. The prospectus contained "Net" figures under a statement favorably comparing the "Net" to the receipts from a ranch. The financial records Cushmans gave McGregor included statements with these same figures. Bill Cushman testified at trial that the financial statements would be misleading to someone not knowledgeable in accounting. A jury could find false representations were made on this evidence.

Further, the jury had sufficient evidence to find McGregor reasonably relied on the representations. A seller's superior knowledge of the financial condition of a business is a factor in determining a purchaser's right to rely on the seller's representations about that financial condition. Bails v. Gar (1976), 171 Mont. 342, 349, 558 P.2d 458, 462. Cushmans, as owners and operators of the business, had knowledge superior to McGregor's about the past income

9

and profits of the business. Even assuming McGregor should have investigated the statements and ascertained their truth or falsity, he is only required to use reasonable diligence and whether he did so is another factual question for the jury. McGregor questioned Cushmans, talked to the Phillips' representative and received an appraisal of the business. The jury had sufficient evidence to find that McGregor adequately investigated the business and reasonably relied on Cushmans' representations. We find no error in the District Court's failure to direct a verdict for defendants on the claim of actual fraud.

In the second issue, defendants argue that rescission was not available as a remedy to the plaintiffs because they sold or disposed of the wholesale operations and could not return this important part of the business as required by rescission. Section 28-2-1713(2), MCA, states that the rescinding party "must restore to the other party everything of value which he has received from him under the contract or must offer to restore the same, upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so." Section 28-2-1716, MCA, states that " . . . the court may require the party to whom [rescission] is granted to make any compensation or restoration to the other which justice may require." When this Court considered the requirement of restoration in O'Keefe v. Routledge (1940), 110 Mont. 138, 103 P.2d 307, we recognized the matter as one of equity and quoted the Kentucky Court in Black Motor Co. v. Green (1934), 79 S.W.2d 409, 411:

> "An absolute and literal restoration of
> the parties to their former condition" is
> not required; it is "sufficient if such

10

> restoration be made as is reasonably
> possible and such as the merits of the
> case demand."

110 Mont. at 146-147, 103 P.2d at 310. Where circumstances have changed so that complete rescission is not possible, "[t]he trial judge must use his discretion in doing equity, and this Court will not reverse that decision short of a showing of abuse of that discretion." Scott v. Hjelm (1980), 188 Mont. 375, 380, 613 P.2d 1385, 1387-1388. The record on appeal reflects no abuse of discretion. The trial judge acted properly in permitting the jury to consider rescission. We hold that, under these circumstances, plaintiffs' inability to completely restore defendants to their original condition, alone, would not foreclose rescission as a remedy.

Section 28-2-1713(1), MCA, requires a party use reasonable diligence to "rescind promptly upon discovering the facts which entitle him to rescind . . . " The element of promptness corresponds with the defense of laches. "Laches is negligence in the assertion of a right. It exists when there has been an unexplained delay of such duration or character as to render the enforcement of an asserted right inequitable." Brabender v. Kit Manufacturing Co. (1977), 174 Mont. 63, 67-68, 568 P.2d 547, 549. In Brabender, the plaintiffs purchased a mobile home from the defendants and took delivery in November 1971. Four days later they complained about the condition of the home and stated they would not accept it, but refused to let defendants make any repairs. The plaintiffs later paid all scheduled installments due on the contract for purchase and continued to live in the home intermittently until May 1973. There were no further communications between the parties until plaintiffs filed suit in February 1976 seeking rescission or

11

in the alternative, damages. We held that the plaintiffs'

suit for rescission was barred by laches and their suit for

damages was barred by the applicable four year statute of

limitations.

> " . . . Under ordinary circumstances, a
> suit in equity will not be stayed for
> laches before, and will be stayed after,
> the time fixed by the analogous statute,
> but if unusual conditions or
> extraordinary circumstances make it
> inequitable to allow the prosecution of a
> suit after a briefer, or to forbid its
> maintenance after a longer, period than
> that fixed by the analogous statute, a
> court of equity will not be bound by the
> statute, but will determine the
> extraordinary case in accordance with the
> equities which condition it. When a suit
> is brought within the time fixed by the
> analogous statute, the burden is on the
> defendant to show, either from the face
> of the complaint or by his answer, that
> extraordinary circumstances exist which
> require the application of the doctrine
> of laches. On the other hand, when the
> suit is brought after the statutory time
> has elapsed, the burden is on the
> complainant to aver and prove
> circumstances making it inequitable to
> apply laches to his case."

Brabender, 174 Mont. at 63, 568 P.2d at 550, quoting Shell v.

Strong (10th Cir. 1945), 151 F.2d 909, 911.

The defendants here did not plead, nor do they argue

on appeal, that any statute of limitations bars plaintiffs'

claims. The two-year statute of limitations for fraud acts

as an aid in determining whether the delay in the assertion

of plaintiffs' claims, along with any other circumstances, so

prejudiced the defendant that laches should bar the remedy of

rescission. The plaintiffs had notice of circumstances that

should have put them on inquiry of possible fraud at the time

of sale and in 1978 when the net income did not reflect the

earlier representations. Defendants point out that the

plaintiffs, as early as August 1977, were aware that the

wholesale customer in Nevada City had closed, that a consignee contract was not available and that A-G rental was not available. In his testimony, McGregor stated that in 1978 he knew he was not realizing the expected net income. He had the benefit of financial statements at the close of each year. This information was sufficient to put him on inquiry, thus the knowledge of misrepresentations and fraud will be imputed to him. Lasby v. Burgess (1930), 88 Mont. 49, 62-63, 289 P. 1028, 1032. Nevertheless, the plaintiff continued to make payments and operate the business without complaint until about November 1981. These facts constitute laches, or a failure to use reasonable diligence to rescind promptly on the part of the plaintiffs. Therefore, we hold the District Court erred in permitting the jury to consider rescission as a remedy for the plaintiffs.

The District Court instructed the jury on the implied covenant of good faith and fair dealing. In ruling on objections to the instructions, the court stated that they defined the duty required for an allegation of constructive fraud. Defendants argue on appeal that the implied covenant has no application in a case involving an arms-length contract. Plaintiffs argue that defendants had a duty to disclose the true profitability of the business after making misleading statements, and that a breach of this duty was a breach of the implied covenant of good faith and fair dealing.

We recently discussed the implied covenant of good faith and fair dealing in Nicholson v. United Pacific Insurance Co. (Mont. 1985), P.2d , 42 St.Rep. 1822. There, in upholding a damage award for a breach of this implied covenant, we stated:

13

> The nature and extent of an implied
> covenant of good faith and fair dealing
> is measured in a particular contract by
> the justifiable expectations of the
> parties. Where one party acts
> arbitrarily, capriciously or
> unreasonably, that conduct exceeds the
> justifiable expectations of the second
> party. The second party then should be
> compensated for damages resulting from
> the other's culpable conduct.

Nicholson, P.2d at , 42 St.Rep. at 1829. A breach
of this implied covenant which results in damages can thus
give rise to an action in tort. In order to recover punitive
damages, in addition to any recovery for the tort, plaintiffs
must prove that defendants' actions in breaching the implied
covenant of good faith and fair dealing met the requirements
of § 27-1-221, MCA. Nicholson, P.2d , 42 St.Rep. at
1829-1830.

The jury instructions given in the case at bar stated
that good faith means honesty in fact in the conduct or
transaction concerned, apparently taken from the Uniform
Commercial Code, § 30-1-201(19), MCA, and then equated the
implied covenant to an obligation imposed by law on
defendants to do nothing to deprive plaintiffs of the
benefits of their commercial transaction. The tort of breach
of the implied covenant of good faith and fair dealing, as
defined in Nicholson, requires more than a lack of "honesty
in fact." As discussed above, it requires, at a minimum,
that defendants' actions were arbitrary, capricious or
unreasonable and exceeded plaintiffs' justifiable
expectations. We hold that the instructions given to the
jury on this issue inadequately defined the tort.

The fourth issue concerns whether the jury should have
been permitted to consider recovery on a theory of
constructive fraud. Section 28-2-406(1), MCA, defines

14

constructive fraud as "any breach of duty which, without fraudulent intent, gains an advantage to the person in fault. . . by misleading another to his prejudice . . . " Contrary to defendants' contentions, no fiduciary or confidential relationship need exist between the parties to justify a finding of constructive fraud. Mends v. Dykstra (1981), 195 Mont. 440, 449-450, 637 P.2d 502, 507-508. Where sellers, by words or conduct, create a false impression concerning serious impairments or other important matters and subsequently fail to disclose the relevant facts, constructive fraud may be found. Moschelle v. Hulse (Mont. 1980), 622 P.2d 155, 159, 37 St.Rep. 1506, 1510. In Moschelle, the sellers made misleading statements about the rotting floor and foundation of the buildings, the wiring, the sewer lines and the seasonal flooding in the basement. They told the buyers that income from the business would cover payments under the purchase contract and the buyers' living expenses. This Court relied on the "pattern of repeated concealments," the buyers' inability to discover the true condition of the premises and profitability of the business, and the buyers' lack of experience. 622 P.2d at 159, 37 St.Rep. at 1510. In the case at bar, defendants made general statements about the profitability of the business in addition to the figures in the prospectus and the financial statements. Plaintiffs claimed other facts were misrepresented as well. When viewing this evidence most favorably for the plaintiffs, Jacques, 199 Mont. at 504, 649 P.2d at 1325, the District Court did not err by submitting the question of constructive fraud to the jury.

Defendants also question the special verdict's reference to constructive fraud. Since this case is remanded, we need not address this topic.

The defendants contend that waiver and estoppel operate to bar any relief to the plaintiffs as a matter of law. Waiver is the voluntary, intentional relinquishment of a right. Kelly v. Lovejoy (1977), 172 Mont. 516, 520, 565 P.2d 321, 324. A waiver of a right of action will be declared only when the party clearly manifests such an intention. Koch v. Rhodes (1920), 57 Mont. 447, 458-459, 188 P. 933, 937, cited in Falls Sand and Gravel Co. v. Western Concrete (Mont. 1967), 270 F.Supp. 495, 501. The presence of voluntariness and the requisite intent are necessarily questions of fact. Consequently, we hold that the District Court did not err by presenting the issue of waiver by plaintiffs to the jury.

The doctrine of estoppel, to successfully prevent the assertion of a claim of fraud, requires knowledge of the fraud at the time of the execution of the contract. 37 Am.Jur.2d, Fraud and Deceit, §386. In Montana, we have held that estoppel "has no application where the omissions of the party claiming estoppel brought about the problem." Carroccia v. Todd (Mont. 1980), 615 P.2d 225, 228, 37 St.Rep. 1437, 1440; and First Sec. Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040. The evidence presented in this case indicates the plaintiffs did not have full knowledge of the claimed fraudulent acts at the time they entered the contract. Further, the defendants' misrepresentations and failure to disclose brought about the problem. The District Court correctly refused to instruct the jury on estoppel as requested by the defendants.

16

The District Court's refusal to give two of the instructions on defenses offered by the defendants forms the basis of the sixth issue. One concerned the elements of estoppel, properly refused for the reason stated above. The second stated: "Regardless of the falsity of statements, a party is estopped from recovery if there is a long continued silence and failure to raise objections," citing Kelly, 172 Mont. at 520, 565 P.2d at 324. In Kelly, this Court held that the plaintiffs, by acquiescing in the presence of horses, waived their right to enforce a restrictive covenant prohibiting livestock. Kelly did not concern false statements by a party, nor did it concern a long continued silence. The use of "estopped," both in Kelly and in the instruction, was confusing in that the issue under discussion was waiver rather than estoppel. We note also that defendants offered no instructions which would explain the word "estopped" as used in that context. The District Court did not err under these circumstances when it refused to give this instruction.

The seventh issue concerns plaintiffs' requested damages for loss of interest and mental and emotional distress in addition to recission.

> On rescission of a contract, the court will, where necessary to effect complete justice, award to the party not in default his expenses necessarily incident to the contract.

17 Am.Jur.2d, Contracts, §519. In Silvast v. Asplund (1935), 99 Mont. 152, 42 P.2d 452, this Court permitted an award for lost interest in addition to rescission. The historical reason for not permitting both rescission and damages is that a party may receive a double recovery. In this case the jury was instructed "[T]hat you are not allowed to award damages which would in effect allow a double recovery." A recovery

17

of lost interest would not duplicate any recovery plaintiffs might have received through rescission in this case. Therefore, we hold that the District Court did not err by allowing the jury to consider this item of damages.

One jury instruction stated that if they found for the plaintiffs, they "must award them damages for all emotional distress and mental anguish suffered as a result of the Defendants' conduct." (Emphasis added.) This instruction, in effect, directs a verdict on damages for emotional distress even if plaintiffs recovered only on their contract claim.

As this Court stated in Johnson v. Supersave Markets, Inc. (Mont. 1984), 686 P.2d, 209, 41 St.Rep. 1495:

> We agree with the Oregon court's conclusion: "We do not yet live, however, in an 'eggshell society' in which every harm to property interests gives rise to a right of action for mental distress . . . "
>
> . . .
>
> In determining whether the distress is compensable absent a showing of physical or mental injury, we will look to whether tortious conduct results in a substantial invasion of a legally protected interest and causes a significant impact upon the person of plaintiff. (Emphasis in original.) (Citations omitted.)

686 P.2d at 213, 41 St.Rep. at 1500. In Johnson, the plaintiff had been improperly arrested and testimony from at least one witness showed he had suffered "devastating emotional impact" from the tortious conduct. 686 P.2d at 213, 41 St.Rep. at 1500. Although McGregor testified that his financial problems bothered him a lot and "at times, it would show up at home," the record reflects no serious emotional distress or anxiety as required by the holding in Johnson, supra. We hold that this instruction improperly

18

required the jury to award damages for emotional distress and mental anguish without finding a significant impact on the plaintiff.

In addition, plaintiffs claim that the award for mental anguish and distress was proper as a result of defendants' breach of the implied covenant of good faith and fair dealing. As stated above, the jury was not properly instructed on this tort. Thus, the award of damages for mental anguish and distress must be reversed on this basis as well.

The two final issues on this appeal question the award of costs and attorneys' fees to the prevailing party. Our decision in this case renders these issues moot.

Reversed and remanded for a new trial.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I dissent.

I would affirm the decision of the District Court in this case, especially because after remand and a further trial, it appears to me that the results will be about the same.

My interpretation of the majority opinion is that it does the following things: (1) denies recovery for rescission because of laches; (2) permits recovery for breach of contract; (3) permits recovery for constructive fraud; (4) denies recovery for a breach of the implied covenant of good faith; and (5) denies recovery for attorneys fees.

On remand, the cause will be submitted in a new trial on issues of breach of contract and constructive fraud. A breach of contract action of course, sounds in contract. On the other hand, a constructive fraud action sounds in tort. Whether in contract or in tort, the McGregors should be able to recover their payments to the Cushmans in the sum of $78,323. That amount was awarded in the first trial. In addition, because constructive fraud is also a basis for recovery, the rules relating to tort damages apply. In Gibson v. Western Fire Insurance Company (Mont. 1984), 682 P.2d 725, 41 St.Rep. 1048, we held that the statutory allowance for recovery of damages in tort cases, for all detriment proximately caused by a tortfeasor, would allow recovery for amounts other than simply the amount of the actual damages, as for example economic loss and emotional distress. Gibson v. Western Fire Insurance Company was, of course, a bad faith action. However, by analogy, since

20

Gibson defined the elements of damages in tort cases, we would eventually hold that emotional distress is an element of recovery in proper cases for damages in tort, which would include a constructive fraud case.

It is clear to me, that in making the representation respecting net profit, Cushmans were guilty of at least constructive fraud, if not actual fraud. It appears to me that a new trial will result in at least the same amount of damages as were awarded earlier and that remand for retrial in this case is a waste of judicial resources, and an unfair imposition upon a plaintiff who has the right to recover. Therefore, I would affirm.

John G. Sweeney
                          Justice

21

Mr. Justice Frank B. Morrison, Jr., dissenting:

The majority opinion finds error in (1) granting rescission; (2) submitting an instruction on the implied covenant of good faith and fair dealing; (3) awarding damages for severe mental and emotional distress. The jury did not decide the rescission question. The court granted a rescission in the judgment but any relief granted for rescission has no effect upon the jury award for damages in the tort case. They are separate matters. I only dissent to the granting of a new jury trial on the damage question. It is not necessary to discuss the $5,000 award for mental distress as that could be simply stricken if the majority deems the evidence insufficient for submission on that issue. The question on mental and emotional distress is a close one and I would not be adverse to striking that $5,000 award from the verdict. I strongly oppose granting a new trial as there is clearly no basis for granting same.

The majority grants a new trial on the basis of the court having given instruction no. 24. That instruction stated:

> You are instructed that Hope and Paul Cushman owed William and Linda McGregor an implied-in-law duty of good faith and fair dealing that they would do nothing to deprive the plaintiff of the benefits of the commercial transaction between the parties. The duties or obligations arising from the purchase and sale agreement between the parties imposed an obligation of good faith in the negotiations, performance, and enforcement of those duties and obligations. Good faith is defined as honesty in fact in the conduct or transaction concerned. If you find that the defendants violated this obligation imposed by law, the plaintiffs are entitled to be compensated for all the detriment or injury proximately caused thereby whether that detriment or injury could be anticipated or not.

22

This instruction was given prior to our decision in Nicholson v. United Pacific Insurance Co. (Mont. 1985), ____ P.2d ____, 42 St.Rep. 1822. The instruction here given is, in my opinion, better than the one given in the Nicholson case. However, the instruction there given was tendered by the defense and therefore could not be objected to by the defendant on appeal.

In Nicholson, the Court did not wish to bless the instruction given but did, for the first time, articulate the following rule:

> The nature and extent of an implied covenant of good faith in fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the others culpable conduct.

42 St.Rep. 1829.

The instruction given by the court in the case at bar is more restrictive than the new rule articulated by the court in Nicholson. The two rules are similar in many respects. However, the conduct referred to in instruction no. 24 contemplates that the duties and obligations arising from the purchase and sale agreement be breached in a dishonest way by one of the contracting parties for a cause of action to arise under "implied-in-law duty of good faith and fair dealing." The standard articulated in Nicholson is broader in that the reasonable expectation of the parties can be breached by arbitrary, capricious and unreasonable conduct. In other words, under the standard adopted by this Court in Nicholson, one can incur liability for breach of the covenant where one acts negligently. The instruction given by the District Court in this case would appear to require that the

23

contracting parties act honestly and only if they fail in that regard, is there a remedy.

The majority's insistence on reversing the verdict in this case based upon the giving of instruction no. 24 is appalling. Not only was the instruction narrower than the one approved in Nicholson, but the duty of good faith and fair dealing was not even submitted to the jury in the verdict form. The following excerpt is taken from the "special verdict":

> ISSUE NO. 1
>
> (The burden of getting a "yes" answer is on the plaintiffs.)
>
> Have the plaintiffs proven by a preponderance of the evidence that defendants engaged in actual or constructive fraud in the course of the transactions and dealings between the parties that led to the consummation of a contract between them on June 7, 1977?
>
> __X__ YES                      _____ NO
>
> If your answer to the preceding issue is "yes," then please answer the following issue no. 2; if your answer to the preceding issue is "no," then please proceed to answer issue no. 4.

The jury was not asked about the implied covenant of good faith and fair dealing. They found fraud. They were properly instructed on both constructive fraud and actual fraud. The jury then, in issue no. 3, found the amount of actual damages to be $78,323, the amount of mental anguish to be $5,000, and awarded an offset of $9,000. Judgment was thereupon entered by the District Court in accordance with the jury verdict. It is clear that the jury made no findings with reference to the implied covenant of good faith and fair dealing and the giving of instruction no. 24 could in no way have created reversible error.

We recently decided the case of Martin J. Kleinsasser v. Superior Derrick Service, Inc., et al. (Mont. 1985), 708 P.2d 568, 42 St.Rep. 1662. The case was determined by a five-judge panel consisting of Chief Justice Turnage, Justices Gulbrandson, Hunt, Morrison and Sheehy. Justice Sheehy dissented. In that case, the issue here involved was presented four square. Plaintiff contended that the instructions given on strict liability were incomplete and misleading. Indeed, court's instruction no. 16 was most incomplete in its attempt to define strict liability. However, the jury, in a special verdict form, was only submitted the negligence theory. The jury found no negligence. Strict liability was not submitted to the jury although the court gave incomplete instructions on strict liability. In that case, the majority said:

> Plaintiff contends that the instructions given on strict liability offer an incomplete and misleading statement of the law. Any error alleged is harmless when the plaintiff did not object to a special verdict form which required the jury to decide the case on negligence alone. Given a jury instruction on strict liability in tort, no matter how incomplete, would not have cured counsel's failure to offer a verdict form which would have allowed a jury to consider strict liability in tort.

708 P.2d 571, 42 St.Rep. 1666.

In the Kleinsasser case, I voted with the majority to affirm a verdict in favor of defendant because only the negligence theory was submitted to the jury on a special verdict form. In this case, only constructive fraud and fraud were submitted in the special verdict form and the jury found in favor of the plaintiff on these theories. No mention was made of the implied covenant of good faith and fair dealing and it could not be prejudicial error to have given

25

an incomplete instruction defining a tort which was not submitted to the jury.

The bottom line is that in Kleinsasser, the majority wished to affirm the defense verdict and so properly relied upon the fact that the incomplete instruction was not prejudicial because the verdict form only considered negligence. Since the majority was right in its application of legal principles, I voted with the majority opinion although I personally disagreed with the jury verdict finding in favor of the defendant.

Now we have a case where the jury has found in favor of the plaintiff and the majority wishes to reverse the verdict. The majority reverses on an instruction which the majority erroneously finds to be incomplete. However, assuming arguendo that the instruction is incomplete, well established legal principles, affirmed and applied in Kleinsasser, dictate a finding by this Court that any incompleteness could not have infiltrated a jury verdict based upon constructive fraud or fraud.

This Court continues to apply whatever legal principles are desired to achieve the necessary result. Again, the people of this State and the practicing members of the trial bar are left with a revolving door approach to the resolution of every controversy.

_____
Justice

26