MR. JUSTICE WEBER
delivered the Opinion of the Court.
This is an appeal from a jury verdict and judgment entered by the District Court of the Second Judicial District, Silver Bow County, in favor of the Noonans and against First Bank Butte (FBB). The jury awarded the Noonans $800,000 for loss of profits, wages, business opportunities, and credit, and $700,000 for emotional distress. We reverse and remand for a new trial.
FBB raises nine issues on appeal. The case requires a new trial based on two of the issues raised. First, the jury was ‘improperly instructed on the tort of bad faith, and second, the jury was improperly instructed on emotional distress. For the guidance of court and *331 counsel on remand, we also discuss the issues of whether the jury should have been instructed on both the implied and statutory duties of good faith, the propriety of excluding certain testimony of an attorney for the Noonans, and whether the jury should have been instructed on negligence. Because we remand the case for new trial, we will not address the issues raised by FBB on sufficiency of the evidence.
Excelsior Meats was a partnership in Butte, Montana, operated by brothers Leo and Dan Noonan. Leo and Dan both have limited educational backgrounds and began working in the family business at a young age. Leo took care of the business aspect of the partnership and Dan worked in the store. Leo also operated a cattle feedlot. The cattle from the feedlot were sold to Excelsior Meats. Dan began his own feedlot operation in May 1981, and also sold cattle to the partnership.
Larry Dwyer was a loan officer at FBB. He had known Leo and Dan Noonan for a long time. There is a conflict in the testimony as to whether Mr. Dwyer first approached Leo Noonan or vice versa, but in 1973, FBB began loaning money to Leo Noonan. The initial loan was for $7,000 to purchase cattle. The Noonans maintained a large checking account balance at FBB and promised to transfer $12,000 in certificates of deposit to FBB. No security was required for the loan.
Leo Noonan continued to borrow from FBB and by April 1975 had over $77,000 on loan. In 1975, FBB also loaned the Noonans $100,000 to expand their meat market building. This loan was secured by a real estate lien on their property.
In November 1980, John Johnson took over the Noonan loans at FBB. At that time, the loans to Leo Noonan and the partnership totaled almost $200,000, excluding the real estate loan. The loans were secured by feedlot cattle, inventory, accounts receivable, furniture, and fixtures of the meat market. When he took over the loans, Mr. Johnson requested financial statements and tax returns. Bob Prigge, a CPA and the Noonans’ accountant, prepared the financial statements.
Mr. Johnson testified that at the time he believed the Excelsior Meats’ financial statements supported FBB’s loans to the Noonans. However, because the statements reflected only the Excelsior Meats’ partnership income, they did not accurately show the profitability or debt of the total Noonan operations. Leo Noonan’s feedlot business, which lost money in every year between 1977 and 1981, was not re- *332 fleeted in the financial statements. Mr. Prigge testified that he offered to provide tax returns for the feedlot operation but that Mr. Johnson refused. Mr. Johnson testified that he was not informed that the financial statements given to him were incomplete.
The financial statements did not disclose that between 1978 and 1981 the Noonans borrowed $125,000 from K.B. Williams, or that they borrowed $45,000 in 1980 from the McLaughlins. Of even greater significance, the Noonans did not disclose to anyone in FBB and the financial statements did not disclose $220,000 owed by Leo Noonan to Miners Bank at the end of 1980, and $93,000 owed by Dan Noonan to Montana Bank in August 1981.
Based on the financial statements, Mr. Johnson renewed a $70,000 loan to Leo Noonan and the partnership in November 1981, and a $250,000 loan in December of the same year. The $70,000 loan was due on demand and was secured by certificates of deposit on account with FBB. The $250,000 loan was due in November 1982 and was secured by 220 head of steers at the feedlot, and by the inventory, accounts receivable, furniture, and fixtures at Excelsior Meats.
In March 1982, Leo Noonan received a letter from Miners Bank requiring payment of one of his delinquent loans. He contacted his attorney, who arranged a meeting with Miners Bank and FBB. At that meeting the Noonans disclosed debts of $980,156.54. Their assets, as of their most recent financial statement, for fiscal year 1980, were $509,800. This information is contained in defendants’ Exhibit 10, introduced at trial.
On learning of the financial position of the Noonans, FBB contacted its attorneys. On their advice, and acting under the default provision of its security agreement, FBB froze the assets in the Noonans’ partnership checking account and cashed in their certificates of deposit. The Noonans’ counsel presented a workout plan to all three banks, but FBB refused to go along with the plan. In April 1982, FBB took control of and liquidated Excelsior Meats pursuant to an authorization for peaceful repossession of collateral signed by Leo and Dan Noonan.
Leo and Dan Noonan filed for bankruptcy individually and on behalf of the partnership in June 1982. They received discharges in bankruptcy in October 1982. After the discharges, they paid $9,432 to bring current their mortgage payments to FBB and $8,100 to bring current other obligations on the market, including repair bills caused by FBB’s repossession of the building. FBB returned the building to them, and Dan Noonan reopened the business.
*333 In March 1984, the Noonans sued FBB. Dan Noonan testified his sales are approximately one-half their 1981 level, he has a hard time getting credit, and because of the bankruptcy he lost his USDA license, which enabled him to sell wholesale. The jury returned a verdict in favor of the Noonans for $800,000 in lost profits and $700,000 in emotional distress. FBB appeals.
I
Was the jury improperly instructed on the implied covenant of good faith and fair dealing?
FBB argues that the implied covenant of good faith and fair dealing cannot apply where a statutory duty of good faith exists. Here, a statutory duty of good faith is present under the Uniform Commercial Code, Section 30-1-203, MCA:
“Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement.”
FBB also contends that, even if an instruction on the common-law duty of good faith is allowed in this case, the one given was inadequate.
This Court has not prohibited application of an implied covenant of good faith and fair dealing where there is a statutory duty of good faith present. In the past, the Court has extended the implied duty of good faith and fair dealing to cases involving banks dealing with their customers. In Tribby v. Northwestern Bank of Great Falls (Mont. 1985), [217 Mont. 196,] 704 P.2d 409, 419, 42 St.Rep. 1133, 1142, we extended the implied covenant of good faith and fair dealing to the commercial area of bank-customer relations. In Nicholson v. United Pacific Ins. Co. (Mont. 1985), [219 Mont. 32,] 710 P.2d 1342, 1347, 42 St.Rep. 1822, 1828, we noted the extension of the tort theory to banks dealing with customers and cited Tribby and First National Bank of Libby v. Twombly (Mont. 1984), [213 Mont. 66,] 689 P.2d 1226, 41 St.Rep. 1948. In Northwestern Nat. Bank v. Weaver-Maxwell (Mont. 1986), [223 Mont. 33,] 729 P.2d 1258, 43 St.Rep. 1995, we allowed a case of a bank-customer dispute to be remanded for retrial on a bad faith theory. In Central Bank of Montana v. Eystad (Mont. 1985), [219 Mont. 69,] 710 P.2d 710, 42 St.Rep. 1850, we declined to determine whether the jury could be instructed on both the implied duty of good faith and fair dealing and the statutory duty of good faith imposed by Section 30-1-203, MCA, as part of the Uniform Commercial Code. Instead, we found *334 that there was sufficient evidence as a matter of law to support the trial court’s denial of the tortious bad faith counterclaim. We hold that both an instruction on the implied covenant and an instruction on the UCC duty of good faith may be proper in this case. Whether such instructions are proper will depend upon the evidence submitted on retrial.
The instruction given on the implied covenant of good faith and fair dealing, instruction No. 24, was:
“You are instructed that First Bank Butte and its agents owed plaintiffs an implied-in-law duty of good faith and fair dealing in the banking relationship, that it should do nothing to unnecessarily deprive the plaintiffs of the benefits associated with the banking relationship between the parties. The duties or obligations arising from the banking relationship between the parties imposed an obligation of good faith in both the performance and enforcement of those duties and obligations. Good faith is defined as honest [sic] in fact in the conduct or relationship concerned. If you find that First Bank or its agents violated this obligation imposed by law, the plaintiffs are entitled to be compensated for all of the detriment or injury proximately caused thereby whether that detriment or injury could be anticipated or not.”
This instruction is virtually identical to an instruction given in McGregor v. Mommer (Mont. 1986), [220 Mont. 98] 714 P.2d 536, 546, 43 St.Rep. 206, 218. It defines good faith as “honesty in fact”, which is the definition given in the Uniform Commercial Code, Section 30-1-201(19), MCA. We held in McGregor that breach of the UCC standard of honesty in fact is not enough to constitute a tort. The minimal requirement for the tortious breach of the covenant of good faith and fair dealing is action by the defendant which was arbitrary, capricious or unreasonable, and exceeded plaintiffs’ justifiable expectation. McGregor, 714 P.2d at 543. The instruction given in this case inadequately defined the tort. We hold, as in McGregor, that giving of this instruction is reversible error.
II
Did the lower court erroneously instruct the jury on damages for emotional distress and mental anguish?
Instruction No. 20 on emotional distress read:
“You are instructed that the law does not prescribe any definite standard by which to compensate an injured person for emotional *335 distress or mental anguish. This case does not require that any witness should have expressed an opinion as to the amount of damages that would compensate for such injury. The law does require, however, that when making an award for emotional distress or mental anguish, the jury shall exercise calm and reasonable judgment. If you find for plaintiffs, you must award them damages for all emotional distress and mental anguish suffered as a result of the defendant’s conduct. The damages must be just and reasonable.”
Notwithstanding the substantial amount of damages awarded for emotional distress, the record is devoid of significant evidence on this point. There was no medical testimony indicating emotional distress. The only testimony on this issue was the testimony of the Noonans themselves, and they made only general statements of mental strain and stress, inability to sleep, and stiffness. As a result, the statement in the above jury instruction that damages “must” be awarded may have misled the jury, especially in view of their $700,000 damage award for emotional distress.
The instruction given is, in relevant part, identical to an instruction given in McGregor. There, we held the jury instruction in effect directed a verdict on emotional distress because it stated the jury must award damages for all emotional distress suffered. We cited Johnson v. Supersave Markets, Inc. (Mont. 1984), [211 Mont. 465,] 686 P.2d 209, 41 St.Rep. 1495, as authority for the proposition that we do not yet live in an eggshell society where every harm to a property interest gives rise to a right of action for mental distress. We said that mental distress is compensable absent a showing of physical or mental injury only if the tortious conduct results in a substantial invasion of a legally protected interest and causes a significant impact on the person of the plaintiff. McGregor, 714 P.2d at 544-45. Another instruction given in this case improperly required the jury to award damages for emotional distress without a finding of a substantial invasion of a legally protected interest and a significant impact on the person of the plaintiffs. We hold that the trial court erred in giving this instruction.
Ill
Did the trial court err in excluding testimony of William Kebe, the Noonans’ attorney during some of the time at issue in this action?
Attorney William Kebe represented the Noonans prior to and during the foreclosure of Excelsior Meats. At trial, FBB attempted to *336 elicit testimony from Mr. Kebe about his impressions and observations as to whether FBB’s conduct constituted bad faith, and about certain discussions he had with attorneys for FBB and Miners Bank. The District Court applied the attorney-client privilege and ruled the testimony inadmissible.
In Kuiper v. Dist. Court of Eighth Judicial Dist. (Mont. 1981), [_Mont__,] 632 P.2d 694, 38 St.Rep. 1288, we held that the attorney-client privilege applies to communications made by a client to his attorney and legal advice given in response in the course of professional employment. Section 26-1-803, MCA. The District Court correctly excluded testimony by Mr. Kebe on his evaluation of the Noonans’ legal position because it was covered by the attorney-client privilege. Conversations occurring in the presence of third parties are not privileged. Jones v. Jones (Mont. 1980), [190 Mont. 221,] 620 P.2d 850, 852, 37 St. Rep. 1973, 1976. In this case, the District Court correctly allowed FBB to elicit testimony from Mr. Kebe as to the conversations that took place at the meeting between bank officials, attorneys, and the Noonans. However, the District Court excluded Mr. Kebe’s testimony about his conversations with third parties when the Noonans were not present. These conversations are not protected by the attorney-client privilege. On retrial, the District Court shall allow Mr. Kebe to testify about his conversations with third parties, whether or not the Noonans were present.
IV
Did the trial court err in submitting the negligence theory to the jury?
FBB asserts that the jury should not have been separately instructed on negligence. We discuss the instruction because the case is returned for retrial. We have approved an instruction on a separate negligence theory in the employer-employee context of an action alleging breach of the implied covenant of good faith and fair dealing. Flanigan v. Prudential Federal Sav. & Loan (Mont. 1986), [221 Mont. 419,] 720 P.2d 257, 263, 43 St.Rep. 941, 948; Crenshaw v. Bozeman Deaconess Hosp. (Mont. 1984), [213 Mont. 488,] 693 P.2d 487, 493, 41 St.Rep. 2251, 2259. However, such an instruction must be supported by the pleadings and the evidence. We'conclude that, on retrial, a negligence instruction may properly be given if the court concludes that the allegation of negligence is established in the *337 pleadings and if the proof establishes a claim for the elements of negligence, including unreasonable conduct on the part of the bank.
Reversed and remanded for new trial.
MR. CHIEF JUSTICE TURNAGE and MR. JUSTICES HARRISON and GULBRANDSON concur.