No. 81-139

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

NIGEL MENDS and CATHERINE J. MENDS,

Plaintiffs and Appellants,

vs.

WAYNE R. DYKSTRA, PATRICIA R. DYKSTRA,
and JERRY R. GOSSEL,

Defendants and Respondents.

---

Appeal from:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin.
Honorable W.W. Lessley, Judge presiding.

Counsel of Record:

For Appellants:

Berg, Coil, Stokes and Tollefsen, Bozeman, Montana

For Respondents:

Zion Law Firm, Helena, Montana

---

Submitted on briefs: July 30, 1981

Decided: November 25, 1981

Filed: NOV 25 1981

Thomas J. Keasney
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiffs sued for rescission of a contract to purchase defendants' dwelling, or in the alternative, for damages because of defects in the dwelling. A judgment was entered for the defendants in accordance with the jury verdict in the Eighteenth Judicial District Court, Gallatin County. We reverse the District Court, holding that it erred in refusing plaintiffs' instructions on constructive fraud, and in giving an alternate fraud instruction.

In May of 1978, while viewing homes for sale in the Belgrade area with their realtor, Nigel and Catherine Mends noticed a "For Sale" sign outside the house owned by Wayne and Patricia Dykstra, and stopped in, unannounced, to meet the owners and look the house over. Because they liked the looks of the house, the view, and the price of $41,000, the Mends made an earnest money offer of $200 which was accepted by the Dykstras. Between the end of May and early August when the Mends moved into the house, they visited it three times. Each time they were permitted to walk around the house and yard pretty much as they pleased. During the Mends' first, unannounced, visit, Mrs. Dykstra pointed out that the house had no central heating, but was heated by a fireplace in the dining room, a fireplace in the living room, and three electric space heaters. During the second visit, the Dykstras told the Mends that Mr. Dykstra is a carpenter and that he built the house himself for his family to live in; that the Dykstras and their young children had lived comfortably in the house summer and winter; and that there had been no problems with pipes freezing since Dykstras closed in the garage. Mr. Dykstra mentioned that

the house was not entirely completed -- the well house should be insulated, and a half-bathroom and the family room made of the covered-over garage needed finishing and insulating.

On the third visit in mid-July, Mr. Dykstra explained again that the family room and half-bath needed finishing and the well house needed insulating. Mr. Mends asked Mr. Dykstra if there were any other problems with the house he should know about and Mr. Dykstra responded that he could not think of anything else.

The Mends were unable to obtain conventional financing for the purchase of the house unless they installed central heating, so they applied for an F.H.A. insured loan and signed a second earnest money agreement, this one indicating that the amount due the Dykstras would be $42,800. The second agreement contained the phrase "conditional upon no additional work to be required by appraisal" written in by Mrs. Dykstra. Neither party wanted to have to invest more in alterations to the house. It was understood and agreed that if the independent appraisal required by the F.H.A. indicated repairs or alterations were necessary before an F.H.A. insured loan could be approved, the sale was off.

The appraisal, conducted by an independent appraiser as required by the F.H.A., resulted in approval of an F.H.A. insured loan to the Mends, who then purchased the Dykstra house. The closing was on August 8, 1978. The Dykstras had given the Mends the house key during the Mends' third visit, in mid-July; the Mends moved in at least a week before closing. They found the house pleasant and comfortable until September. They did not call in anybody to inspect the house in the week or more before closing.

In late September, with cooler weather, the Mends tried
to heat their house. The fireplace in the dining room would
not draw and filled the house with smoke. The concrete
firebox in the living room fireplace began to crack and
crumble with the heat, leaving a hole at the back of the
firebox. The fall rains caused leakage around the dining
room chimney, which was surrounded at the roof level by
asbestos boards held in by asbestos wadding and chips instead
of proper flashing. There were gaps at the chimney corners
which permitted water to run down onto the ceiling and drip
into the dining room. Nigel Mends sealed off the chimney
with roofing compound and installed a woodstove. The installation
uncovered a number of other defects in the construction of
the house, which were later confirmed by a Bozeman housing
inspector. Ceiling joists were few and far between; the
sheetrock ceiling was laid across an imitation beam made of
1 x 4's. In some places it was just balanced on the "beam."
Ceiling joists balanced against the 1 x 4's or were held up
by twisted bailing wire "like you would a fence corner."
Much of the ceiling insulation was upside down. An electrical
junction box between the sheetrock and insulation above the
living room ceiling was uncovered with bare wires exposed
and connections dangling. Roof rafters which were too short
were pieced together "with little broken up pieces" of 1 x
4's. The Mends' attempts to contact Dykstras were unsuccessful,
and the Dykstras' realtor informed Nigel Mends that the
Mends were picky and the so-called flaws were merely "difference
in perception of detail."

The Mends bundled up and made do with their woodstove
although the house was drafty and cold and because the water
heaters were very small there often was not enough hot

water. In mid-December, and again before New Year's Day, the pipes froze. The second time they remained frozen until April. The pump in the well house froze and burst, as did the pipes under the bathroom. When a plumber was called he was unable to get under the house because the "crawlspace" was only a few inches deep. During the winter, the Mends made several more attempts to establish communication with the Dykstras, but their letters were not answered. They also called in a professional building contractor to look at the house. His testimony reveals that he had lived next door to the Dykstras for two winters, 1975-76 and 1976-77. During that time their plumbing froze "five or six times" each winter, and the Dykstras came to his home for water and to borrow a space heater. The contractor testified that pipes froze in both the new and old sections of the house. When the Mends called him over to check out the house, he found "about 85 percent" of the flaws listed below by building inspector Barrick, and he advised Nigel Mends to bulldoze the house down and start over; the cost of correcting the defects would be at least as great as starting from the ground and building a safe and stable new house. Finally, on July 3, 1979, the Mends got Bozeman city building inspector, Don Barrick, to come out and look for defects in their house. His report to them, dated July 15, 1979, alarmed the Mends enough that they moved out of the house before the end of July. Barrick's testimony, besides affirming the existence of those flaws already described, indicates that his inspection uncovered the following major defects, among many other defects of less importance:

1) The concrete footings for the house were not set in the ground but poured over the top of the ground, leaving

the entire structure subject to frost heaves and differential settlement which would break the foundation and crack the walls. Some cracking in the footings and in the rockwork above the foundation was already evident.

2) The exterior siding was made of Celotex, a kind of fiberboard which is not intended for exterior use, as it absorbs moisture and will eventually deteriorate and fall off. Certain parts of the siding in the Mends house were already "very near the point of falling off."

3) Because of the use of dissimilar wires (copper and aluminum), splices without junction boxes, and breaker boxes with higher amperage level than the wires, the electrical system posed a serious fire hazard.

4) Improper framing over doors and windows, under the floors, and in the roof had resulted in dragging doors, springy floors, and a sag in the roof. In fact several floor joists were supported by a rock sitting on the ground under the house.

5) The firebox was concrete instead of firebrick; the concrete had cracked from the heat and allowed heat buildup behind the firebox; the area behind the firebox was not protected and there was real danger of a major fire.

6) The plumbing system was inadequately vented; the sewer gases might back up, creating a sanitation problem.

7) The woodstove in the family room (closed-in garage) was too close to combustible materials and posed a fire hazard.

Barrick testified that the home was neither safe nor stable and that repairs would be very costly. He stated that a person experienced in construction practices could discover most of the defects "just by looking at them," but

testified that, in order to look at many of them, it would be necessary to scratch under the concrete footings, crawl around underneath the house if there was crawlspace, remove sheetrock walls, remove panels over wiring, open electrical distribution boxes, and go up into the attic.

Nigel and Catherine Mends filed this action, initially for damages alone, against Wayne and Patricia Dykstra, both realtors involved in the sale, and the independent fee appraiser, Jerry Gossel, whose initial appraisal of the house resulted in the approval of an F.H.A. insured loan. Subsequently the complaint was amended to allow for rescission of the contract and a return to Mends of all moneys paid, as an alternative to damages. The action was dismissed as to the two realtors. On the morning trial began, plaintiffs Mends and defendant Gossel stipulated that Gossel consented to judgment against him in the amount of $5,000.

Trial commenced on October 14, 1980; and continued for four days. The District Court ruled that there was no constructive fraud in this case, refused to instruct the jury on constructive fraud, and advised counsel that they were not to talk about constructive fraud in their closing arguments. The jury returned a verdict against the plaintiffs. The District Court denied plaintiffs' motion for judgment notwithstanding the verdict and for a new trial. The District Court allowed defendants' deposition costs in the amount of $497.50. Plaintiffs appeal.

Plaintiffs maintain that the District Court erred in refusing to give plaintiffs' instructions No. 14 and No. 17, and in giving its own proposed instruction A. (Given as instruction No. 9.)

During the settling of jury instructions plaintiffs

objected to one of defendants' instructions because, although it defined actual fraud, it failed to define constructive fraud. The following discussion then took place:

"THE COURT: [to defense counsel] [I]s it your position that constructive fraud can be used in this case?

"MR. REYNOLDS: [defense counsel] No.

"THE COURT: Is that because of the relationship of the parties?

"MR. REYNOLDS: Because of the relationship between the parties and because of the contract between the parties.

"THE COURT: I so rule. I so rule. No constructive fraud, sir.

". . . I've ruled that there isn't any constructive fraud. I'm sure we're going to be in a position where we're going to have to take your arguments. But, I assume that you're not going to be embarred [sic] by me admonishing either one of you. You're not talking about constructive fraud."

As a result of the trial court's ruling, plaintiffs' proposed instructions 14 and 17 were refused. Instruction 17 states:

"The consent of the party of a contract must be free. An apparent consent is not real or free when obtained through fraud or mistake.

"Fraud is either actual or constructive.

". . . [statutory definition of actual fraud omitted.]

"Constructive fraud consists in:

"1. Any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

"2. Any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

"Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting

> in an unconscious ignorance or forgetfullness [sic] of a fact, past or present, material to the contract."

The definitions included in this instruction are virtually identical to those statutory definitions of actual fraud, (Section 28-2-405, MCA), constructive fraud (Section 28-2-406, MCA) and mistake of fact (Section 28-2-409, MCA). Instruction 14 states:

> "The plaintiffs have alleged that they were fraudulently induced into entering into the contract with the defendants. Fraud of the nature involved in the claim of fraudulent inducement is defined as either constructive fraud or actual fraud.
>
> "Constructive fraud occurs when a party to a transaction conceals from the other party material facts about the nature of the transaction.
>
> ". . . [common law definition of actual fraud omitted.]
>
> "If you find that the defendants Dykstra have committed either constructive or actual fraud, then you may also find that they are liable for damages as a result of fraud in the inducement as against the plaintiffs.

The trial court instructed the jury as follows:

> "You are instructed that where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud." (Instruction No. 9.)

Plaintiffs objected to that instruction as not being a complete statement of the law. Plaintiffs maintain that in Lyle v. Moore (1979), ____ Mont. ____, 599 P.2d 336, 339, 36 St. Rep. 1307, 1312, and in BAJI 12:36 (4th Ed.), both cited by the trial court as sources for the instruction, the law allowed for exceptions when a duty to disclose would exist.

In Lyle v. Moore, supra, the finding of a duty to disclose turned on the existence of a fiduciary relationship between seller and buyer. This Court's full statement was:

-9-

"As we have noted, there are times when the law imposes a duty upon a party to speak rather than to remain silent and thereby to disclose information to place the person with whom he is dealing on an equal footing with him. The failure to speak in such a case amounts to the suppression of a fact which should have been disclosed and constitutes fraud."

The BAJI citation was considerably abbreviated by the District Court. The full instruction in the current volume of BAJI follows:

"Except as you may otherwise be instructed, where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts.

"A duty to disclose known facts arises where the party having knowledge of the facts is in a fiduciary or a confidential relationship which imposes on him a duty of disclosure.

"A fiduciary or a confidential relationship exists whenever under the circumstances trust and confidence reasonably may be and is reposed by one person in the integrity and fidelity of another.

"[A duty to disclose known facts arises [in the absence of a fiduciary or confidential relationship] where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party.]" (BAJI, 6th Ed.) (Emphasis supplied.)

The parties agree that an indispensable element of constructive fraud is a breach of duty to disclose material facts, but defendants argue that no such duty existed here because no fiduciary relationship or confidential relationship existed between the parties. Defendants argue that the Mends and the Dykstras were neither friends nor acquaintances but "opposite parties to an arms-length business transaction." Finally, defendants concede that in a few cases this Court has found that special circumstances surrounding the transaction

-10-

impose a duty upon the seller to disclose certain information to the buyer.

In Moschelle v. Hulse (1980), ____ Mont. ____, 622 P.2d 155, 159, 37 St. Rep. 1506, 1510, "a pattern of repeated concealments of the true state of affairs concerning the condition of the premises and probable business earnings" resulted in a finding that breach of a duty to disclose was constructive fraud. In ~~Poulson~~ *Poulsen* (JK) v. Treasure State Industries, Inc. (1981), ____ Mont. ____, 626 P.2d 822, 829, 38 St. Rep. 218, 226, this Court found constructive fraud when sellers failed to disclose to buyers "serious impairments to the property which [the buyers] had no reason to suspect." In Poulson, 626 P.2d at 828, 38 St. Rep. at 225, we relied upon Russell v. Russell (1969), 152 Mont. 461, 465-466, 452 P.2d 77, 79-80, in support of our finding of constructive fraud: ". . . fraud is complete where a vendor knowingly suppresses a serious vice of his property which the vendee had no reason to suspect."

Defendants argue that there was no concealment, no suppression of defects in the building. They point out that plaintiffs were permitted to look the house over whenever they visited, that an independent appraiser had evaluated the building, and that plaintiffs had been perfectly free to call in professionals to inspect the house in the several weeks before closing, after the Dykstras had vacated the premises and turned the key over to the Mends. Defendants maintain that in support of their claims of constructive fraud, plaintiffs rely solely upon Wayne Dykstra's statement to Nigel Mends that there were no other problems with the house that he could think of. This is not enough, argue

defendants, to bring this dispute under the "special circum-
stances" rule which imposes a duty to disclose upon the
seller.

Plaintiffs argue that the trial court refused to instruct
the jury in matters crucial to their case, i.e., mistake and
constructive fraud. It is true instructions Nos. 10-14
informed the jury that if they found that plaintiffs' consent
to the contract was given by mistake or obtained by fraud or
by an unlawful act or omission of defendants, they might
also find that plaintiffs were entitled to rescind the
contract or collect damages. But the reference to fraud is
qualified by the words "as explained to you," and the only
explanation of fraud allowed in the instructions or during
closing argument was the explanation of actual fraud.
Furthermore, there is no instruction whatsoever explaining
mistake of fact.

The District Court's refusal of plaintiffs' instructions
Nos. 14 and 17 and its inclusion of the abbreviated BAJI
instruction on duty to disclose (No. 9) followed its ruling
that constructive fraud was not a proper element of this
case. The trial court made no ruling whatsoever on the
existence or absence of mistake, and yet, in refusing plaintiffs'
proposed instruction No. 17, refused the only instruction
defining mistake. Mistake of fact is a basis for the
rescission of a contract and was a critical element of
plaintiffs' case. As a result of the trial court's refusal
of the instruction, the jury was not instructed on the
elements of mistake of fact.

The trial court ruled that there was no constructive
fraud in this case because of the relationship of the parties
and because of the contract between the parties. It is true

that there was not a fiduciary relationship or a confidential relationship between the parties, but there may have been special circumstances which in Montana can justify the finding of constructive fraud. See Poulson v. Treasure State Industries, Inc., supra, where a seller was found to have committed constructive fraud upon a buyer by failing to disclose serious impairments to the property sold which the buyer had no reason to suspect. In Poulson, there was neither a fiduciary relationship nor a confidential relationship between the parties; there was a contract. This Court stated:

> ". . . defendants had knowledge of pollution
> violations at the shale plant including the
> hammermill, elevators, spray tower and
> storage and truck loading facilities. Further-
> more, defendants were aware of the water
> drainage problem . . . The record is void of
> any attempt by defendants to disclose this
> information to plaintiffs." Poulsen v.
> Treasure State Industries, ____ Mont. at ____,
> 626 P.2d at 828-829, 38 St.Rep. at 225-226.

Again, in Moschelle v. Hulse, supra, we found constructive fraud where there was neither a fiduciary nor a confidential relationship and the parties had executed a contract of sale. There are striking, factual, similarities in Moschelle and the present case. In Moschelle, this Court stated:

> "Although the record does not clearly establish
> actual fraudulent intent on the part of the
> defendants, there can be no doubt that their
> representations concerning the subject of the
> sale amounted to constructive fraud. Several
> of their statements were misleading on their
> face and thus required further elaboration so
> as not to give the plaintiffs the wrong
> impression. Helen Hulse told the plaintiffs
> that the building was in good condition, but
> the defects which plaintiffs later discovered
> showed that further repairs were needed to
> bring the building up to standard. Guy Hulse
> told plaintiff Brent Moschelle that he had
> installed new wiring in the building. He
> neglected to tell him that he had done so
> more than thirty years before. The cost to

bring this wiring up to standard was estimated
at $3,259.30. Helen Hulse told plaintiff
Brent Moschelle that the tavern was connected
to the city sewer system, but she neglected
to tell him that he would be responsible for
the maintenance of 200 feet of 100-year-old
pipe which ran between the tavern and city
line. . .

"The defendants' statements cannot be excused
simply because deliberate misstatements may
not have been proven. The facts indicate a
pattern of repeated concealments of the true
state of affairs concerning the condition of
the premises and probable business earnings.
Withholding relevant facts concerning purchased
property can be a fraudulent act. See Russell
v. Russell (1969), 152 Mont. 461, 452 P.2d 77.
Furthermore, where a vendor by his conduct or
words creates a false impression concerning
a matter of vital importance to the purchaser,
full disclosure of relevant facts may be re-
quired. See Twing v. Schott (1959), 80 Wyo.
100, 338 P.2d 839; 12 Williston on Contracts
(3rd ed.), §1498, at 387; Restatement of
Contracts, §472(1)(b), Comment b.

"Under the facts here, the defendants were
under a duty to make such disclosures as would
erase the false impressions created in the
minds of the plaintiffs that repairs to the
premises were not needed and that winter earn-
ings were sufficient for the plaintiffs' needs."
Moschelle v. Hulse, _____ Mont. at _____, 622
P.2d at 158, 159, 37 St.Rep. at 1509-1510.

In this case the presence of a contract and the absence

of a special relationship between the parties is not enough

to preclude a finding of constructive fraud. The record

indicates that, apart from Wayne Dykstra's assurance to

Nigel Mends that there was nothing more he needed to know

about the house, a jury could have found numerous instances

of the Dykstras giving misleading information and telling

half truths which were sufficient to establish a duty to

disclose. A jury could have found that 1) the Dykstras told

the Mends that there had been no problems with pipes freezing

since the garage was covered, but neglected to tell them

that the pipes had frozen in the old section of the house

which was unaffected by covering the garage; 2) the Dykstras

-14-

said that the fireplaces were used to heat the house, but neglected to mention that the concrete firebox in the living room had already cracked and been filled in and repainted; 3) the Dykstras showed the Mends that the house was electrically lighted and partially electrically heated, but neglected to indicate that the electrical system was so poorly constructed that it posed a serious fire hazard; 4) the Dykstras assured the Mends that the house was cozy and comfortable in summer and winter, but did not mention that they liked their house cooler than most houses. There are more instances alleged than we can here recount of statements by the Dykstras which, while not strictly untrue, were sufficiently misleading to create a duty to disclose. That the duty was not met is evident in the testimony of Wayne Dykstra himself. On cross-examination, he admitted to being aware of the flawed foundation, sub-standard framing and flooring, particle-board siding, and dangerous fireplace and wiring; yet he testified that he did not inform the Mends of any of these defects.

Defendants argue that because the defects were evident, there was no concealment, relying upon Lowe v. Root (1975), 166 Mont. 150, 156, 531 P.2d 674, 677-678, wherein this Court states:

> " . . . [if] appellant's inspection of the premises revealed or would have revealed the true physical condition of the premises, she would have no right to rely upon any concealment by respondents with respect to the physical condition of the premises."

In Lowe, however, the Court found that "all of the alleged defects were open and notorious . . . A superficial inspection of the building would reveal these deficiencies." Lowe v. Root, 166 Mont. at 156, 531 P.2d at 678. In the case at

bar, according to the testimony of Don Barrick, the Bozeman building inspector, in order to look at many of the defects in the Dykstra house, the Mends would have had to crawl under the house where possible, dig under the foundation, remove sheetrock panels, flooring and insulation, and uncover plumbing and wiring. Surely the prospective buyer of a house should not be required to take the house apart board by board to determine its condition. The evidence indicates that many of the defects in this house were not open and notorious, and far more than a superficial inspection was necessary to determine their existence. See Moschelle v. Hulse, ____ Mont. at ____, 622 P.2d at 159, 160, 37 St. Rep. at 1510, 1511.

It is evident to this Court that constructive fraud was a crucial element, if not the crucial element of this case. Furthermore, there were numerous facts in dispute. Without making factual determinations properly left to the jury the District Court could not have decided that constructive fraud was not an element of this case. We hold that the District Court erred in refusing plaintiffs' proposed instructions No. 14 and No. 17, in giving its own instruction No. 9, and in refusing to allow any mention of constructive fraud in closing argument.

We reverse and remand this case for retrial.

_____
Justice

We concur:

_____
_____
_____
_____
Justices

-16-