No. 87-169

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

ROIL ENERGY CORPORATION, INC.,
CLINTON J. WHITE, SHIRLEY J. WHITE,
and JOSEPHINE R. WHITE,

          Defendants and Appellants.

     -vs-

DRILCON, INC.,

          Plaintiff and Respondent,

---

APPEAL FROM:   District Court of the Eleventh Judicial District,
               In and for the County of Flathead,
               The Honorable Leif Erickson, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Murray, Kaufman, Vidal & Gordon; Daniel W. Hileman,
          Kalispell, Montana
          Leaphart Law Firm; W. William Leaphart argued, Helena,
          Montana

     For Respondent:

          Scott & Tokerud; Keith Tokerud argued, Great Falls,
          Montana

---

                              Submitted:   October 28, 1987

                              Decided:     January 19, 1988

Filed: JAN 1 9 1988

                    *Ethel M. Harrison*
          _____
                         Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Roil Energy Corporation and Clinton J. White, appeal from a Flathead County District Court jury verdict awarding Drilcon, Inc., $1,577,595.20 in damages for breach of contract, negligence, and constructive fraud. All three causes of action arise out of a contract entered into by Drilcon and Roil for the purpose of drilling an oil well. The jury found that Roil breached its contract with Drilcon and held Clinton J. White, as President and alter ego of Roil Energy Corporation, personally liable for $809,023.20 in contractual damages by piercing Roil's corporate veil. The jury found White additionally liable for his negligence and constructive fraud in the amount of $768,595. Defendants Roil and White appeal the jury verdict. We affirm.

Val Holms incorporated Roil Energy Corporation in Montana in April of 1979. Roil did no business and was not capitalized at that time. Holms sold Roil to Clinton White in June of 1981 to cancel a $3,000 loan. Holms was unable to repay the loan and suggested that White "purchase" Roil for $3,000.

White's previous business experience includes involvement in several real estate developments and management of two credit bureaus. White testified that he bought the corporation to recoup his $3,000 loan to Holms and to protect himself from personal liability while he experimented with oil industry investments. White appointed himself president of Roil and designated his mother and wife as the other officers and directors. Holms held himself out as an assistant vice-president to potential investors. Roil was never capitalized.

In June of 1984, White negotiated and signed a "farm-out" agreement with Pennzoil Corporation whereby Roil

2

was to drill an oil well on a Montana leasehold provided by Pennzoil. Roil was to bear all risk, cost, and expense of drilling the well in exchange for royalties in the event the well actually produced.

Holms then contacted Drilcon, a Texas corporation, and negotiated a day-work drilling contract. Under the terms of the contract, Roil was to pay Drilcon $6,500 per day to drill an oil well. Section 7 of the contract provided that a third party, Protea Capital Corporation of Dallas, Texas, would establish an escrow account in the amount of $459,553 and would pay Drilcon on a biweekly basis. The escrow was requested by Drilcon to guarantee payment because Drilcon was unfamiliar with Roil Energy Corporation.

On August 13, 1981, Drilcon forwarded the contract to White for his signature, but before White could sign, Protea backed out. Holms then secured another investor and arranged to have Sun Escrow of Palm Springs, California, replace Protea. Holms and an officer of Sun Escrow telephoned Drilcon with assurances that the escrow had been set up in a sufficient amount to cover Drilcon's estimated expenses for drilling the well. Sun gave written confirmation of the same in a telegram to Drilcon.

After receiving similar assurances from Holms and Sun, White, in his capacity as president of Roil, signed the original drilling contract on August 17, 1981. Neither party attempted to amend the contract to reflect the substitution of Sun Escrow for Protea Capital Corporation.

Drilcon began drilling on August 28, 1981, and submitted invoices to Sun on a timely basis. However, Sun made no payments on the first two invoices so Drilcon contacted Holms about the delay in payment. Holms professed no knowledge of the problem and promised to investigate. On September 21, 1981, Drilcon received notification that Sun Escrow could not pay because there were no funds in the

3

escrow account. Drilcon again called Holms and received assurances that he would check the situation out and get back to them. After two days with no response from Holms, Drilcon ceased drilling at a depth of approximately 7,700 feet with expenses of approximately $204,000.

Holms again solicited the help of numerous potential outside investors and represented to Drilcon that funding was inevitable. Drilcon interviewed a number of these potential investors and believed that the funding would soon be forthcoming. In the meantime, Drilcon requested a written guaranty and a promissory note from Holms before it would resume drilling. Holms complied by sending Drilcon a telegram personally guaranteeing the cost of drilling on behalf of himself and Clinton White.

Holms immediately sent a copy of the telegram guaranty to White. White consulted his attorney about the telegram and was advised that Holms could not bind White with the guaranty. Shortly thereafter, White informed Drilcon that Holms' guaranty was unauthorized. Holms also gave Drilcon a security interest in certain oil properties and a financial statement listing his net worth at over $2.6 million. In fact, as Drilcon was to learn much later in preparing for litigation, Holms had a negative net worth at the time he gave his personal guaranty and he no longer had an interest in the oil properties.

At trial, the parties disagreed as to what Holms' relationship was with Roil. Holms represented to Drilcon and others that he was an assistant vice-president and testified to the same at trial. White disputes that Holms ever had authority to act in any official capacity for Roil. White specifically denied at trial that Holms ever had authority to guarantee anything on White's or Roil's behalf. However, White admits that he did not inform Drilcon that Holms was not a vice-president of Roil Energy.

4

Based on Holms' guaranty and representations, Drilcon resumed drilling in late September 1981 and eventually reached the 12,500 foot depth called for in the contract on December 2, 1981. White allowed Drilcon to resume drilling depite his knowledge that the escrow was not funded, that Holms' guarantee was worthless, and despite his own inability to guarantee costs. Tests indicated that the well would not produce. Shortly thereafter, Roil defaulted on its obligations to Pennzoil. Pennzoil had the well plugged on December 19, 1981.

A Drilcon representative testified his company believed that Roil, with the help of outside investors, would pay the costs of drilling or, alternatively, that Holms and White would pay. On December 31, 1981, Clinton White's attorney wrote to Drilcon and stated that Roil would be "unable to make the required payments for the drilling expenses incurred . . . by virtue of the contract."

Drilcon sued Roil Energy in Texas on January 8, 1982, and obtained a default judgment for contract damages. The validity of the Texas judgment is questionable due to improper service of process. Drilcon also obtained judgments against Val Holms and Sun Escrow thereby prompting both to file bankruptcy. To date, Drilcon has not recovered from Holms, but has collected a $170,000 settlement from Sun Escrow, said amount being deducted from the Montana district court judgment. Drilcon filed this suit on August 13, 1982. The jury found in favor of Drilcon and awarded damages. Roil and White appeal and raise numerous convoluted issues. We identify the following issues for review:

1. Must there be a fiduciary relationship as a prerequisite to a finding of constructive fraud?

2. Did the District Court commit reversible error when it allowed the jury to compare Holms' and Sun Escrow's fraud with the alleged negligence of Clinton White and Roil Energy?

5

3. Did the fraud of Sun Escrow and Holms supersede any negligence by Roil Energy and/or Clinton White?

4. Did the trial court correctly instruct the jury on the elements of piercing the corporate veil?

5. Is constructive fraud sufficient to pierce the corporate veil?

6. Is there substantial evidence in the record to support the jury's piercing Roil's corporate veil?

7. Is there substantial evidence in the record that Roil Energy breached its contract with Drilcon?

In their first issue, appellants assert that the District Court committed reversible error when it gave the following instruction to the jury:

> The plaintiff Drilcon, Inc., has alleged that the defendants are liable to it on the basis of constructive fraud. Constructive fraud means any breach of duty which, without fraudulent intent, gains an advantage to the person in fault by misleading another to its prejudice. There need be no fiduciary duty or confidential relationship between parties to justify a finding of constructive fraud. Where a party, by his words or conduct creates a false impression concerning serious impairments or other important matters and subsequently fails to disclose relevant factors, constructive fraud may be found. (Emphasis added.)

The second sentence of the above jury instruction is taken from § 28-2-406, MCA. Defense counsel objected to the third sentence of the instruction at trial on the grounds that a fiduciary relationship is required before constructive fraud can be found. Appellants contend the instruction was prejudicial because the special verdict form required the jury to decide whether defendant Clinton White committed constructive fraud.

6

Three Montana cases appear to support appellants' argument that there must be a breach of a fiduciary relationship in an action for constructive fraud. Rowland v. Klies (Mont. 1986), 726 P.2d 310, 43 St.Rep. 1788; Morse v. Espeland (Mont. 1985), 696 P.2d 428, 42 St.Rep. 251, 253; Ryckman v. Wildwood, Inc. (1982), 197 Mont. 154, 641 P.2d 467. The latest of these cases, Rowland, states:

> Constructive fraud is a breach of fiduciary duty. (Citation omitted.) If there is no fiduciary duty in the first place, constructive fraud will not lie.

Rowland, 726 P.2d at 316. There are, however, several Montana cases that recognize an exception to the rule as stated in the above cases. McGregor v. Mommer (Mont. 1986), 714 P.2d 536, 43 St.Rep. 206; Mends v. Dykstra (1981), 195 Mont. 440, 637 P.2d 502; Poulson v. Treasure State Industries (Mont. 1981), 626 P.2d 822, 38 St.Rep. 218; Hardin v. Hill (1967), 149 Mont. 68, 423 P.2d 309. These cases stand for the proposition that, under certain "special circumstances", neither a confidential relationship nor a fiduciary relationship is needed to find constructive fraud.

The last sentence of the jury instruction in question embodies the "special circumstances" necessary for the jury to find constructive fraud in this case:

> Where a party, by his words or conduct creates a false impression concerning serious impairments or other important matters and subsequently fails to disclose relevant factors, constructive fraud may be found.

It is evident from the record that White's words and conduct created a false impression that either Roil, its officers, or its shareholders would cover the costs of drilling the oil-well. It is also evident that White subsequently failed to disclose relevant information concerning Holms', Roil

7

Energy's, and his own ability to fulfill the obligations imposed by the drilling contract.

"Special circumstances" exist in this case which support the jury's finding of constructive fraud. First, White used an improperly perfected corporate entity to shield himself from personal liability and he failed to disclose these corporate imperfections to his creditors. White also failed to come forward with the truth about Holms' financial affairs when White knew that Drilcon was relying on Holms' personal guarantee. Finally, White failed to inform Drilcon that Holms was not a corporate officer. The facts of this case provided substantial credible evidence of "special circumstances" for the jury to find White liable on a theory of constructive fraud. Accordingly, the District Court did not err in instructing the jury that no fiduciary or confidential relationship was needed for a finding of constructive fraud under the particular facts presented by this case.

Appellants, in their second issue, argue that any alleged negligence of Clinton White cannot be compared with the fraudulent acts of Val Holms and Sun Escrow. The special verdict form required the jury to apportion negligence between Drilcon, Val Holms, Sun Escrow, Clinton White, and "others." The jury found Clinton White 95% negligent and Drilcon 5% negligent. Defense counsel objected to this portion of the special jury verdict form on the grounds that the fraud of Holms and Sun Escrow intervene and supersede any liability on White's part. Appellants contend that the special verdict form confused the jury, is contrary to Montana law, and constitutes reversible error.

Appellants' argument on this issue must fail for two reasons. First, § 27-1-703, MCA, requires that the negligence of all persons proximately causing damage to the plaintiff is to be compared in a comparative negligence case.

8

White alleged contributory negligence and therefore forced the court to consider comparative fault. Second, and more importantly, the jury reached the right result by apportioning negligence only between White and Drilcon.

It is evident from the jury's apportionment of negligence that appellants were not prejudiced by the special verdict form. The jury did not apportion any negligence to either Holms or Sun Escrow. On the contrary, one-hundred percent of the negligence was apportioned between White and Drilcon. There is no cause for reversal in the absence of prejudice to the party claiming error in the jury instruction. State v. Hay (1948), 120 Mont. 573, 194 P.2d 232. We need not decide whether the special verdict form was erroneous because appellants were not prejudiced.

In their third issue, appellants expand the above argument further by contending that the fraud of Sun Escrow and Holms are intervening causes that supersede appellants' alleged negligence. Notably, appellants did not plead intervening cause or superseding cause in their answer/pre-trial order nor did they offer jury instructions as to this issue. On the contrary, appellants specifically plead contributory negligence in the pretrial order and requested an apportionment of comparative fault. Appellants' failure to offer an instruction regarding superseding/intervening cause renders any alleged error harmless. Kleinsasser v. Superior Derrick Services, Inc. (Mont. 1985), 708 P.2d 568, 571, 42 St.Rep. 1662, 1666.

We also note with regard to appellants' third issue that the jury was instructed as to several legal theories (i.e., respondeat superior, actual and ostensible agency, negligent misrepresentation, etc.) which could be used to hold White liable for Holms' acts. The jury was also instructed as follows:

9

> Instruction No. 8: More than one person
> may be responsible for causing injury.
> If you find that one of the defendants
> was negligent and that his negligence
> proximately caused injuries to the
> plaintiff _it is not a defense that some_
> _third person may also have been_
> _negligent._ (Emphasis added.)

Under the instructions as given in this case, it would be difficult, if not impossible, for the jury to formulate a superseding cause theory on their own initiative. The facts as applied to the jury instructions overwhelmingly support a finding of White's negligence in this case.

Appellants' next issue questions the sufficiency of the jury instructions regarding piercing the corporate veil. The jury was instructed as follows on piercing the corporate veil:

> Roil Energy is a corporation organized
> under the laws of Montana. As a general
> rule the shareholders of a corporation
> are not subject to personal liability for
> corporate obligations. However, a
> corporation's separate identity may be
> disregarded when such corporation is
> under the control of an individual, and
> acted as that individual's agent as to
> the particular transaction, or, when the
> corporation's identity is so identified
> with the individual sought to be held
> liable as to make the corporation and the
> individual one.
>
> . . .
>
> If a shareholder is not the "alter ego"
> of the corporation pursuant to the stated
> elements, he cannot be found personally
> liable for the debts of Roil Energy. If
> you find Clinton White is the "alter ego"
> he can be found personally liable only if
> there is a further showing the
> corporation was utilized as _a subterfuge_
> _to defeat public convenience, to justify_
> _wrong or to perpetrate fraud._ (Emphasis
> added.)

10

The special verdict form asked the following question relevant to this issue:

> B. Was Roil utilized as a subterfuge to defeat public convenience to justify wrong or to perpetrate fraud? (Emphasis added.)

> Answer "Yes" or "No."

The jury answered "Yes" and held White personally liable for Roil's breach of contract. Both the jury instruction and the special verdict form were drafted by the District Court on the basis of a law review article entitled Piercing the Corporate Veil in Montana, 44 Mont.L.Rev. 91 (1983).

Defense counsel objected to the "public convenience" language in the two instructions on the basis that these references confused the jury. Drilcon made a similar objection at trial and counsel for both sides expressed confusion about the meaning of "public convenience." Even the District Court admitted confusion as to the meaning of the term "public convenience." Appellants argue in their forth issue that the words "public convenience" were irrelevant and that the language "caused [the jury] serious confusion."

This Court has repeatedly approved of the "public convenience" language as used in the above instructions. Meridian Minerals Co. v. Nicor Minerals, Inc., et al. (Mont. 1987), 742 P.2d 456, 462, 44 St.Rep. 1516, 1526; Flemmer v. Ming (Mont. 1980), 621 P.2d 1038, 1042, 37 St.Rep. 1916, 1919; State ex rel. Monarch Fire Ins. Co. v. Holms (1942), 113 Mont. 303, 124 P.2d 994. Flemmer quotes with approval a jury instruction using the same language as used in this case. Appellants have presented no evidence that the jury was confused by the words "public convenience" that would justify reversal of this case.

"Public convenience" refers to something fitting or suited to the public need. Black's Law Dictionary 1105 (5th

11

ed. 1979). There is no evidence that Roil Energy was used as a subterfuge to defeat public convenience, but appellants can claim no reversible error because there were sufficient alternative grounds to pierce the corporate veil. The jury was presented with substantial evidence of "fraud" and "justifying wrongs" to pierce the corporate veil under the alternate theories stated in the instruction. The trial court did not err in giving the "public convenience" instruction as one of three alternative grounds for piercing the corporate veil.

Appellants argue in their fifth issue that there is no evidence of actual fraud with which to pierce the corporate veil in this case. Appellants point out that the special verdict form and jury instructions list "fraud" as a basis for piercing the corporate veil. Although the jury specifically found Clinton White guilty of constructive fraud, appellants contend that constructive fraud is insufficient to pierce the corporate veil.

There are two prongs to piercing the corporate veil. The jury must first find that White was the "alter ego" of Roil. White does not contest the sufficiency of the evidence in this regard. Secondly, there must be a showing that the corporate entity was used as a subterfuge to defeat public convenience, justify wrong, or perpetrate fraud. This Court has held that something less than a positive showing of fraud is needed to pierce the corporate veil. E.C.A. Environmental Management Services, Inc. v. Toeynes (Mont. 1983), 679 P.2d 213, 219, 41 St.Rep. 388, 394. Other jurisdictions have held that constructive fraud is sufficient to pierce the corporate veil. White v. Jorgenson (Minn. 1982), 322 N.W.2d 607; Sprecher v. Weston's Bar, Inc. (Wis. 1977), 253 N.W.2d 493; Lewis Trucking Corp v. Commonwealth (Va. 1966), 147 S.E.2d 747. We hold that evidence of either actual fraud or

12

constructive fraud may be sufficient to pierce the corporate veil in a given case.

We also note that the law as instructed in this case does not distinguish between the acts of an alleged corporate agent (Holms) as opposed to the acts of the party sought to be held liable (White). There was fraud in this case. The jury may have used Holms' fraud as an agent of Roil to conclude that "the corporation was utilized as a subterfuge to . . . perpetrate fraud." The instruction does not require that the party sought to be held liable act fraudulently. The instruction only requires that the corporation be used "as a subterfuge to perpetrate fraud."

In their sixth issue, appellants question the sufficiency of the evidence to support any of the three alternative grounds for piercing the corporate veil (i.e., public convenience, justify wrong, and fraud). This Court will not reverse the verdict unless there is no substantial evidence to support the findings of the jury. Poulson v. Treasure State Industries, Inc. (Mont. 1981), 626 P.2d 822, 825, 38 St.Rep. 218, 221. There is substantial credible evidence to support two of the three alternative grounds for piercing the corporate veil in this case.

We first find that there was substantial credible evidence that White was the alter ego of Roil. Roil was not capitalized. White was the majority shareholder and was an officer and director of Roil. White took all actions for the corporation without consulting the other named officers and directors. There was evidence that corporate formalities were not adhered to and that White used his personal funds to pay corporate debts.

Although there is no evidence that White used Roil to defeat "public convenience," we find that there was also substantial credible evidence of actual fraud, constructive fraud, and of White's using the corporate entity to justify

13

wrong. Holms acted as Roil's agent when he committed fraud against Drilcon. White failed to disclose his superior knowledge about Holms' financial condition and telegram of personal guaranty. White admits using the corporate entity to shield himself from liability. He did nothing to manage or supervise Holms yet hoped to gain when and if the oil well was successful. The well was dry and White now hopes to avoid the cost of drilling with an uncapitalized corporation. The jury was entitled to conclude that it would be inequitable or unjust for Drilcon to bear the loss in this case.

Appellants moved for summary judgment prior to trial asking that the trial court rule as a matter of law that Drilcon waived the payment provisions of the contract when it proceeded to drill without a properly funded escrow. The trial court denied the motion. In their final issue, appellants claim that it was error for the trial court to submit the breach of contract issue to the jury and that the motion for summary judgment should have been granted.

Appellants contend that the drilling contract specifically required a third party, an escrow company, to make the required payments to Drilcon. They assert that the escrow provision and the provision in the drilling contract requiring the "operator," Roil, to pay daily drilling costs creates an ambiguity. This alleged ambiguity, appellants argue, should be interpreted against Drilcon because Drilcon drafted the contract.

Appellants also argue that Drilcon waived any right to be paid under the drilling contract when it elected to drill with no money in escrow. White cites Van Ettinger v. Pappin (1978), 180 Mont. 1, 588 P.2d 988, for support. In Van Ettinger, this Court held that the purchasers of a home waived the right to enforce the provisions of a buy-sell agreement when they closed the transaction with knowledge

14

that sellers were in possible breach. Appellants analogize Van Ettinger to argue that Drilcon waived the payment provision of an executory contract when it elected to drill after learning that there was no money in escrow.

Drilcon points to the contract provisions and the intent of the parties to argue that Roil is ultimately liable under the contract. We find that the contract is not ambiguous as to the duties of Drilcon and Roil. The contract does not state that Roil's payment is conditioned on an escrow being set up. Neither the investors nor the escrow company were parties to the contract and it was Roil's duty to fund the escrow.

Even if the escrow provision of the contract is a condition precedent waived by Drilcon, such waiver does not release Roil of its obligation to pay Drilcon. Appellants' reliance on Van Ettinger is misplaced because the contract in the instant case was not wholly executory. Drilcon drilled for a month before it learned of the lack of money in escrow thereby making the contract no longer wholly executory.

White admits that the facts concerning this issue are undisputed. The trial court believed the legal issue of waiver was for the jury to decide. The jury was instructed as to conditions precedent, waiver, ostensible agency, and ostensible authority. The jury found for Drilcon. The question for this Court is whether there is substantial evidence to support the jury's finding that Roil breached its contract with Drilcon.

The contract required the operator (Roil) to pay the contractor's (Drilcon) daily expenses. The contract also required that an escrow be established to ensure payment to Drilcon. The contract is silent as to who was required to secure funding for the escrow. The trial court allowed parol evidence without objection as to the intent of the parties concerning the escrow. Drilcon testified that it was Roil's

15

responsibility to find investors and fund the escrow. White testified that it was Holms' responsibility and that Holms was not an agent of Roil. No one disputes that Drilcon was never paid.

Though some of the evidence presented at trial may appear contradictory, it was the jury's prerogative to choose to believe the testimony of one party to the exclusion of the other. Tompkins v. Northwestern Union Trust Co. of Helena (1983), 198 Mont. 170, 181, 645 P.2d 402, 408. We will not assume the role of jury in this case, but will only review the record to search for sufficient evidence to support the jury's conclusions. Griffel v. Faust (Mont. 1983), 668 P.2d 247, 249, 40 St.Rep. 1370, 1372. There is substantial evidence to support the jury's decision.

We hold that a fiduciary relationship is not needed for a finding of constructive fraud under the "special circumstances" of this case. We also hold that there is substantial credible evidence that White committed constructive fraud against Drilcon. The jury was not instructed as to superseding or intervening cause and White did not offer any jury instructions as to this theory. The jury was instructed as to several other legal theories with which they could hold appellants liable for Holms' acts. There was sufficient evidence to support any of these theories.

The jury was properly instructed as to the elements of piercing the corporate veil. Although the parties were unsure as to the meaning of "public convenience," there is no evidence that the jury was similarly confused to appellants' prejudice. In addition, the jury was presented with alternative theories with which to pierce the corporate veil, i.e., justifying wrong and fraud. There was sufficient evidence to support both of these alternative theories. The corporate veil was properly pierced in this case.

16

Finally, the drilling contract is not ambiguous. Roil was to insure that Drilcon was paid either by funding an escrow or by making the payments itself. Roil waived the escrow provision when it failed to deposit adequate funds in the escrow. The remaining provision in the contract specifically states that Roil was to then pay Drilcon. There is sufficient evidence that Roil breached the contract by not paying Drilcon. Accordingly we affirm the District Court jury verdict on all issues presented by this appeal.

Affirmed.

_____

Justice

We concur:

_____

_____

_____

_____

Justices

_____

The Honorable G. Todd Baugh,
District Judge, sitting for
Chief Justice J. A. Turnage.

17

Mr. Justice John C. Sheehy, dissenting:

I dissent from the foregoing opinion opinion for several reasons.

First, Clinton J. White should be relieved of any liability for the first $217,000 of drilling expenses charged by Drilcon. It is clear that before Drilcon began drilling the well on August 28, 1981, it had been assured by an escrow officer of Sun Escrow of Palm Springs, California, that the escrow company had funds on deposit of $459,000 out of which to pay Drilcon's expenses. Drilcon placed no reliance on Clinton J. White or Roil Energy Corporation through any statement or representation before it began drilling. It relied exclusively upon the fraudulent representation of Sun Escrow Company, that the funds were in place to pay its drilling costs. On September 21, 1981, after Drilcon had drilled down 7,700 feet and earned approximately $217,000 in expenses, Sun Escrow Company wrote Drilcon that there was no money in the escrow.

Clinton White was as much a victim of the fraudulent actions of Sun Escrow as was Drilcon. Up to that point, Drilcon placed no reliance on either Clinton White or Roil Energy, and gave evidence of that nonreliance by refusing to proceed at all until an escrow had been established to Drilcon's satisfaction. Any liability at all of Clinton White, therefore, should exclude the first $217,000 of expenses because that expense was not incurred by Drilcon through any fault, representation, constructive fraud, negligence, or other legal theory obligating Clinton White.

Drilcon recommenced drilling when it received from Holms his fraudulent asset statement and a telegram which Holms sent, purportedly binding Clinton White personally to the

- 18 -

drilling cost. Drilcon began drilling again in spite of having been told by White that he was not going to guarantee the cost of drilling personally and that Holms had no authority to make Clinton White personally liable. Mr. Ed White, the vice-president of Drilcon testified:

> Q. Did Mr. Clinton White ever tell you he would not give his personal guarantee? A. I don't recall him ever saying that. The only thing I ever remember him saying was that Val Holms was not authorized to speak on his behalf.
>
> . . .
>
> Q. Did you have any understanding after talking to Clinton White whether he would give his personal guarantee? A. I don't have a feeling that he would or wouldn't. He didn't deny that he wouldn't, and he didn't say that he would.

As to whether Holms was vice-president of Roil Energy Corporation, the court itself wanted the evidence to be clear and questioned the witness:

> (BY THE COURT) Q. It has been pointed out that Clinton White never denied that Val Holms was vice-president. I guess I would reverse the question. Did Clinton White ever tell you that Val Holms was the vice-president of Roil? A. No.

Drilcon, therefore had no basis upon which to rely on any personal guaranty of Clinton White or any representation that Holms had authority to bind Clinton White for drilling expenses.

Because Drilcon was specifically warned that White was not personally liable and that Holms had no authority to bind him, the discussions in the majority opinion about constructive fraud and piercing the corporate veil are irrelevant. Drilcon proceeded at its peril to complete the drilling of the well.

Nonetheless, some remarks about the majority discussion of constructive fraud and piercing the corporate veil are necessary.

We make fuzzy the liability theory of constructive fraud when we go outside the confidential or fiduciary relationships and find that "special circumstances" can give rise to liability under the theory of constructive fraud. The statutory bases for constructive fraud are a breach of duty or an act or omission especially declared to be fraudulent by the law, each without respect to actual fraud. Section 28-2-406, MCA. Unless we have an act especially declared fraudulent by the law (not present here), we should confine constructive fraud to those cases involving a breach of duty and ordinarily that breach of duty arises either through a confidential or a fiduciary relationship. We have confused the liability theory of constructive fraud (mea culpa) by including in the constructive fraud theory "special circumstances" in cases which really involve negligent misrepresentations of fact. In cases of negligent misrepresentation, the liability is founded not on a breach of a legal duty arising out of constructive or fiduciary relationships, but rather out of a duty to speak in the circumstances, and where fraudulent intent is not an element. To use an example first posed by the late, great Cardozo, if we think of the fields of liability for constructive fraud and misrepresentation as concentric circles with a common center and differing radii, where the liability under each theory is based on misrepresented facts, the breach of a legal duty will create liability whereas a negligent breach may not; the first because the liability is imposed by law, whereas the liability for a negligent breach is based upon ordinary care, and comparative negligence may be considered.

See Ultramares Corporation v. Touche (N.Y. 1931), 174 N.E. 441.

It is because we confused these two fields of liability that the district judge in this case submitted to the jury, as a comparative negligence issue, the determination of comparative negligence of Drilcon, Roil, Sun Escrow, Clinton White and Holms. The jury found Clinton White 95% negligent, and Drilcon 5% negligent. A finding of comparative negligence is completely inconsistent with liability on the theory of constructive fraud, where there is no comparison to be made (undoubtedly the court was thinking of mitigation of damages, and submitted it in the form of comparative negligence). Moreover, because the actions of Holms and of Sun Escrow Company were fraudulent, those actions were not be compared with the negligence, if any, of White.

The issues in this case were hopelessly confused, and I would reverse and remand for a new trial. It goes without saying that if constructive fraud is not sustainable in this case, there could be no piercing of the corporate veil.

_John C. Sheehy_
Justice