**Betty B. COOK and Dewey D. Cook, Plaintiffs,**

v.

**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY (formerly The Bankers Life Company of Des Moines, Iowa), Defendant.**

No. CV 86–239–M–CCL.

United States District Court, D. Montana, Missoula Division.

March 21, 1990.

Thomas J. Beers, Connell, Beers & Mac-
Donald, Missoula, Mont., for plaintiffs.

Larry Riley, Garlington, Lohn & Robinson, Missoula, Mont., for defendant.

## MEMORANDUM

LOVELL, District Judge.

This matter came on for trial before the undersigned sitting with a jury on February 26, 1990, in the United States District Courthouse in Missoula, Montana. Immediately prior to trial, the court ruled on Plaintiffs' pretrial motions. At the end of the Plaintiffs' case, and again at the close of the Defendant's case, the court ruled on several motions for directed verdict. This memorandum sets forth the court's reasons for these rulings.

This case was filed by Plaintiffs Betty Cook and Dewey Cook against Principal Mutual Life Insurance Company ("Principal") for damages resulting from Defendant's alleged failure to pay the proper amount on a claim made for ambulance services under Plaintiffs' health insurance policy. Plaintiffs raised claims of breach of contract, negligent breach of contract, breach of the covenant of good faith and fair dealing, and violation of Montana's Unfair Trade Practices Act, in particular Montana Code Annotated §§ 33–18–201. In addition, Plaintiffs claimed that Principal was estopped from denying coverage for the air ambulance flight in question because Principal had pre-authorized the flight. Plaintiffs sought compensatory damages, including damages for loss of consortium and emotional distress, and also punitive damages.

Betty Cook originally purchased a health insurance policy from Bankers Life Company of Des Moines, Iowa, now known as Principal Mutual Life Insurance Company. Betty's husband, Dewey Cook, was added to the policy as a covered dependent on April 16, 1981, and the policy has been in force since that date.

In May of 1985, while on a trip to Cancun, Mexico, Mr. Cook became ill. Dr. Vasquez, a local physician, diagnosed Mr. Cook as having acute abdominal problems necessitating surgery. Although the doctor was qualified to do the surgery, he indicated that the medical facilities at Cancun were limited and that their x-ray machine was broken.

Dr. Vasquez contacted a representative of an air ambulance service in Mexico, Ana Maria Delarocha Hernadez de Hulko. Ms. Hulko informed Ms. Cook that the costs for their services must be paid prior to the flight. As a courtesy to Ms. Cook, Ms. Hulko contacted Principal's regional office in Portland, Oregon where she spoke to Clarice Arquette, a claims examiner. The exact nature and effect of this conversation was at issue in the trial and went to the jury.

Betty Cook decided to fly her husband from Cancun, Mexico to Missoula, Montana, on May 10, 1985. Upon his arrival in Missoula he was transported by ambulance to St. Patrick Hospital where he was treated by Dr. James Brooke. Dr. Brooke was the emergency room surgeon on call when Mr. Cook arrived in Missoula. He was not Mr. Cook's attending physician nor had he ever had any contact with Mr. Cook prior to this incident. After an initial interview with Mr. Cook for the purpose of deciding whether he was a good candidate for surgery, Dr. Brooke performed an appendectomy.

Following the surgery Dr. Brooke made a phone call to Dr. William Stratford who was listed as Mr. Cook's attending physician on the hospital records. Dr. Stratford, a psychiatrist, had been seeing Mr. Cook for several years on a monthly basis in an effort to help him come to grips with the chronic pain he suffered as a result of a degenerative back condition. Dr. Stratford informed Dr. Brooke that Mr. Cook was addicted to Demerol, a pain medication, but did not visit or counsel with Mr. Cook during his stay in the hospital. Mr. Cook made a normal recovery from the surgery and was released from St. Patrick Hospital on May 22, 1985.

The total cost for the air ambulance service from Cancun to Missoula was $17,-900.00. A claim in that amount was submitted to Principal by Mr. and Mrs. Cook. Principal paid $10,000.00 of the claim on October 14, 1985, an amount which repre-

sented the cost of an air ambulance flight from Cancun, Mexico, to Houston, Texas. Principal paid for the ambulance service from the airport in Missoula to St. Patrick's Hospital and paid the other hospital and medical bills related to this incident.

*Pretrial Motion*

Prior to trial Plaintiffs moved the court to rule that the term "necessary medical treatment," as used in the ambulance provision of the insurance contract, means that treatment considered as necessary medical treatment by the treating physician. In the alternative Plaintiffs sought a ruling that the term "necessary medical treatment," as used in the ambulance provision of the insurance contract, is ambiguous. The court denied Plaintiffs' motion in its entirety finding that the term "necessary medical treatment" is not ambiguous and that what is "necessary medical treatment" is determined by an objective standard rather than subjectively by the treating physician.

> The insurance policy states:
> Covered charges are the actual cost charged to the insured. . . . h) by a hospital or by a licensed ambulance service for necessary transportation by ambulance to and from the hospital. (Maximum covered charge is for transportation to and from a local hospital or the nearest hospital equipped to furnish necessary medical treatment not available in a local hospital.)

There is no definition for the term "necessary medical treatment" within the policy itself and Plaintiffs claim that, because of Mr. Cook's condition, and in particular his emotional and mental condition at the time of his illness, it was medically necessary for him to travel to Missoula, Montana, for treatment.

■ In a diversity case, a federal district court must follow the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Montana court has held that when examining policy language to determine if any ambiguity exists, the words are to be understood in their ordinary and popular sense rather than according to their strict legal meaning unless used by the parties in some technical sense. Mont.Code Ann. § 28–3–502; *Bauer Ranch v. Mountain West Farm Bureau Mutual Ins. Co.,* 215 Mont. 153, 695 P.2d 1307, 1309 (1985); *Transamerica Ins. Group v. Osborn,* 627 F.Supp. 1405, 1407 (D.Mont.1986). The Montana Supreme Court has found, that although the term "necessary" as it is used in the area of medical services is a term of degree, it is not ambiguous. *Fassio v. Montana Physicians' Service,* 170 Mont. 320, 553 P.2d 998 (1976). The term "necessary medical treatment" is not ambiguous as it is used in the ambulance provision of the insurance policy at issue in this case.

Plaintiffs additionally asked the court to rule that the determination of what was "necessary medical treatment" should be left to the sole discretion of the treating physician. This issue has not been directly addressed by the Montana Supreme Court. When a federal court confronts a situation not yet met by the forum state's highest state court, it must seek the rule it believes that state court would adhere to were it confronted with a similar situation. *Transamerica Ins. Group,* 627 F.Supp. at 1407.

Plaintiffs argue that this court should follow the holding of the court in *Van Vactor v. Blue Cross Ass'n,* 50 Ill.App.3d 709, 8 Ill.Dec. 400, 365 N.E.2d 638 (1977). In *Van Vactor,* the court found that the "determination of whether and to what extent hospital services are medically necessary is 'vested solely and exclusively in the judgment and discretion of the treating physician.'" 50 Ill.App.3d at 720, 8 Ill.Dec. at 409, 365 N.E.2d at 647 (citations omitted). The *Van Vactor* case, however, has not been followed in other jurisdictions. *Sarchett v. Blue Shield of California,* 43 Cal.3d 1, 729 P.2d 267, 272, 233 Cal.Rptr. 76, 81 (1987). Other courts take the position that "medical necessity" or similar policy language is an objective standard to be applied by the trier of fact, not a delegation of power to the treating physician. *Id.* (citations omitted).

This issue was simplified in this case when Defendant admitted that the precise

care rendered at St. Patrick Hospital in Missoula was necessary medical treatment. The question then for the jury was whether Houston, Texas, or Missoula, Montana, was the nearest hospital which could furnish the necessary medical treatment, i.e., the treatment actually furnished by Dr. Brooke.

*Motions for Directed Verdict*

■ At the end of the Plaintiffs' case in chief, the court granted Defendant's motions for a directed verdict on the issues of punitive damages and negligent breach of contract. At the close of Defendant's case, the court granted Defendant's motions for directed verdict on the bad faith claims and on the issue of damages for the loss of consortium.

A directed verdict is appropriate when "viewing the evidence in a light most favorable to the non-moving party, the testimony and all the inferences that the jury could justifiably draw therefrom are insufficient to support any other finding," *West America Corporation v. Vaughn–Bassett Furniture Co., Inc.*, 765 F.2d 932 (9th Cir.1985) (citations omitted).

Montana has not yet recognized a claim for negligent breach of contract. After discussion by the court, Defendant's motion for directed verdict on this issue was granted by agreement of the parties.

In order to maintain a claim for punitive damages, a Plaintiff must prove by clear and convincing evidence that Plaintiffs suffered injury to their persons or property through the oppression, fraud, or actual or presumed malice of Defendant. Mont.Code Ann. § 27–1–221 (1985). Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

The theory of Plaintiffs' case was that Missoula, Montana, was the nearest hospital to Cancun, Mexico, which could provide Mr. Cook with the necessary medical treatment due to Mr. Cook's mental and emotional condition. Plaintiffs claimed that Principal did not conduct a reasonable investigation into the medical necessity of Mr. Cook's treatment in Missoula, Montana.

Plaintiffs produced no evidence which would tend to show that Principal acted in an oppressive, malicious or fraudulent manner toward the Cooks when evaluating their claim. Rather, the evidence showed that the claim was carefully reviewed pursuant to Principal's normal procedure at the regional office and was sent to the home office in order that a review could be conducted by Principal's medical staff.

Ms. Joanie Cherrier, a member of Principal's Health Care Resources group, testified that she reviewed the hospital records including the admittance history and the discharge summary and a letter from Dr. Brooke stating that it was medically necessary to transport Mr. Cook to Missoula. Ms. Cherrier determined that the actual treatment furnished to Mr. Cook in Missoula could have been furnished in Houston, Texas, as well. She testified that she did not attempt to contact the treating physicians for any additional information.

Following the initial denial of full payment on Plaintiff's claim, and upon request of Plaintiffs, Principal asked for further clarification from Dr. Brooke on the medical necessity of treating Mr. Cook in Missoula, Montana. Dr. Brooke wrote:

> Mr. Cook chose to return to Missoula for care as his family physician was in Missoula, his medical records were in Missoula, and his medical problems were known in this medical community. Because of his illness and because of the knowledge possessed by his physicians in Missoula, Mr. Cook could not have received better care.

> It certainly would have been a greater risk for Mr. Cook to have sought care for his health problems any place but Missoula.

Plaintiff's Exhibit # 23, page 68.

The second letter was reviewed by the personnel in the Portland office along with the records of the actual care provided and the determination was made that it was not medically necessary to transport Mr. Cook to Missoula.

**1518**

Plaintiffs' claim was also reviewed a third time by Barbara Harlan, a member of the special unit which deals with complaints from state insurance commissioners, after Principal received a complaint from the Insurance Commissioner for the State of Montana. At this time the file contained the second letter from Dr. Brooke, notes of all of the telephone conversations and all written correspondence. Ms. Harlan again determined that it was not medically necessary to transport Mr. Cook to Missoula. There was no further action on the complaint by the Montana State Insurance Commissioner.

Plaintiffs did not produce any evidence by which a reasonable jury could find that Principal had acted in an oppressive, malicious or fraudulent manner towards Plaintiffs when evaluating their claim. The court therefore granted Principal's motion for directed verdict as to punitive damages.

 At the close of Defendant's case the court also granted Defendant's motions for directed verdicts on the bad faith claims and the claim for loss of consortium. In an insurance contract there is implied an obligation of good faith and fair dealing on the part of both parties which requires that neither party do anything unreasonable which deprives the other of the benefits of the contract. *Gibson v. Western Fire Ins. Co.*, 210 Mont. 267, 682 P.2d 725, 730 (1984). Violation of this obligation is referred to as "bad faith".

 The nature and extent of the obligation of good faith and fair dealing is measured by the justifiable expectations of the parties. *Nicholson v. United Pacific Ins. Co.*, 219 Mont. 32, 710 P.2d 1342, 1348 (1985). The minimal requirement for the tortious breach of the covenant of good faith and fair dealing is action by the defendant which was arbitrary, capricious or unreasonable and exceeded the justifiable expectations of the Plaintiffs. *Noonan v. First Bank Butte*, 227 Mont. 329, 740 P.2d 631, 635 (1987). A party against whom liability under a contract is asserted does not breach the implied covenant of good faith and fair dealing by disputing its liability under that contract so long as the party

disputing liability does not act arbitrarily, capriciously or unreasonably. *Tynes v. Bankers Life Co.*, 224 Mont. 350, 730 P.2d 1115, 1124 (1986).

 Plaintiffs also claimed the following violations of Montana's Unfair Claims Practices Act (Act), Mont.Code Ann. § 33-18-201 (1985): 1) misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; 2) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; 3) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; 4) refusing to pay claims without conducting a reasonable investigation based on all available information; and 5) neglecting to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonable clear. *Id.*

 A violation of the Act can give rise to liability only if it is established that there have been other violations and if they have been of such frequency as to indicate a general business practice. *Klaudt v. Flink*, 202 Mont. 247, 658 P.2d 1065, 1068 (1983). Multiple violations occurring in the same claim could be sufficient to show a frequent business practice, as would violations by the same company in different cases. *Id.*

Defendant offered additional testimony concerning the handling of Plaintiff's claim through Clarice Arquette, the claims examiner from Principal's Portland office who initially handled this claim, and Carmen Patricia Schwarz, the claims manager in the Portland office. Ms. Arquette testified that she received a telephone call from Ms. Hulko of the air ambulance service asking for information concerning coverage under the Cook's policy. She explained that the company would cover ambulance service to the nearest hospital and that it would be necessary to send the medical reports before coverage could be determined. Ms. Arquette testified that she had no authority to guarantee coverage over the phone

nor did she guarantee that the cost would be covered.

Ms. Schwarz testified as to the procedure followed on this particular claim. On June 5, 1985, a letter was sent to Betty Cook indicating that Principal had received the bill from the air ambulance service and that the claim would be reviewed to see if Missoula was the nearest location that could have provided the necessary treatment. Principal informed Ms. Cook that it needed the name and address of the attending physician in order to obtain information concerning the treatment which was furnished. Plaintiff's Exhibit # 23, page 27.

On June 20, 1985, a telephone call was placed to Betty Cook informing her that due to the fact Mr. Cook was covered under Medicare, review of their claim would be delayed until Principal received the Medicare EOB (explanation of benefits). A telephone memo dated August 12, 1985, revealed that Principal had received notification that Medicare had denied coverage on the ambulance coverage and that Principal was waiting on the hospital records. Plaintiffs' Exhibit # 23, page 104.

Ms. Schwarz made the initial determination that it was not necessary to transport Mr. Cook to Missoula but sent the file to Des Moines, Iowa, to the home office for expert review to see if there was some medical reason why it was necessary to transport Mr. Cook to Missoula. After review of the file, Ms. Cherrier of the Health Resources Group recommended that Principal pay only $10,000 of the claim. Ms. Schwarz sent a letter denying full coverage and a draft for the partial payment to Mr. McLaren who had been handling the claim for the Cooks.

Ms. Schwarz also testified that she reviewed Dr. Brooke's second letter sent as additional evidence that Principal should reconsider its decision and pay the full amount. Ms. Schwarz testified that the second letter contained no new information as to any additional medical treatment which was provided to Mr. Cook which would have indicated the necessity of transporting Mr. Cook to Missoula for the treatment which he received.

Given the testimony of Defendant's witnesses as to the procedure used and the investigation completed regarding Plaintiffs' claim coupled with the lack of any evidence of arbitrary, capricious or unreasonable conduct on the part of Defendant, the court found that no reasonable jury could find for Plaintiffs on the claims of bad faith.

Plaintiffs also claimed damages for loss of consortium on behalf of Betty Cook. Consortium includes a legal right to the aid, protection, affection and society of the other spouse. *Gunning v. General Motors Corp.*, 239 Mont. 104, 779 P.2d 64 (1989); *Bain v. Gleason*, 223 Mont. 442, 726 P.2d 1153 (1986).

A claim for loss of consortium is based on the husband and wife contracting for obligations of mutual respect, fidelity, and support; thus it follows that the claimant must offer proof that these mutual obligations were fulfilled prior to the other spouse's injury, and that due to the injury, fulfillment of these obligations has been impaired. *Id.* 239 Mont. at 108, 779 P.2d at 67.

Although it is questionable as to whether any damages had in fact been sustained, damages for loss of consortium are tort damages and Plaintiffs' claim fell when the court granted a directed verdict on the bad faith claims.

The claims for breach of contract and promissory estoppel went to the jury which, after several hours of deliberation, returned unanimous verdicts for Defendant on each claim.

The clerk is directed forthwith to notify counsel of entry of this memorandum.